IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

State of North Dakota, et al.,

Appellees/Cross-Appellants,

vs.

Beverly Heydinger, Commissioner and Chair, Minnesota Public
Utilities, Commission, et al.

Appellants/Cross-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**BRIEF OF AMICI CURIAE
THE AMERICAN WIND ENERGY ASSOCIATION
AND
SOLAR ENERGY INDUSTRIES ASSOCIATION
IN SUPPORT OF DEFENDANT-APPELLANTS**

Gene Grace
AMERICAN WIND ENERGY
ASSOCATION
1501 M Street, N.W.
Washington, DC 20005
Telephone: (202) 383-2529
Facsimile: (202) 383-2505
ggrace@awea.org

Rick Umoff
SOLAR ENERGY INDUSTRIES
ASSOCIATION
505 9th St. NW Suite 800
Washington D.C. 20004
Telephone: (202) 556-2877
Facsimile: (202) 682-0559
rumoff@seia.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae, the American Wind Energy Association and Solar Energy Industries Association, stat that they have no parent corporation and no publicly held company owns 10 % or more of the stock of the amici.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF INTERESTS.................................................................1

BACKGROUND……………………………… ..................................................4

SUMMARY OF ARGUMENT ................................................................5

ARGUMENT ...........................................................................................7

I.   THE NGEA DOES NOT VIOLATE THE DORMANT
     COMMERCE CLAUSE, BECAUSE IT SIMPLY FAVORS ZERO-
     EMISSION GENERATION OVER FOSSIL FUELS, WHICH
     DOES NOT DISCRIMINATE AGAINST INTERSTATE
     COMMERCE. ..............................................................................7

A.   The NGEA Does Not Facially Discriminate Against Interstate Commerce
     Because it Equally Bans Purchases from Both In-State and Out-of-State
     Sources……………………………………………………………………...8

B.   The NGEA Does Not Violate the Dormant Commerce Clause Because It
     Satisfies the *Pike* Test And Regulates Even-Handedly to Effectuate a
     Legitimate State Interest and Any Incidental Burdens Are Outweighed by
     Numerous Local Benefits…………………………………………………10

     1.   The NGEA Furthers Legitimate Environmental Protection, Health, and
          Safety Interests…………………………………………………..…10

          a.   States Across the Country Have Enacted Laws Regulating the
               Carbon Emissions of their Utilities' Energy Acquisition…...12

          b.   Construction of New Large Fossil Fuel Facilities Will Create
               Stranded Assets and Harm Ratepayers……………………..…13

   2. Any Incidental Burden on Out-of-State Carbon-Emitting Energy
    Producers is Dwarfed by the Opportunity for Out-of-State Clean
    Energy Producers...................................................................................17

II. THE EXTRATERRITORIALITY PRINCIPLE DOES NOT APPLY TO THE
  NGEA, AND EVEN IF IT DID, THE NGEA DOES NOT VIOLATE THE
  DOCTRINE…………………………………………………………………18

  A. The Extraterritoriality Principle Should Not Be Applied to the NGEA
   Because it Should Not Be Extended Beyond Current Jurisprudence to
   Apply to Energy Policies and the NGEA Does Not Regulate Any Out-Of-
   State Pricing………………………………………………………………19

  B. The NGEA Does Not Satisfy the High Threshold for Illegality under the
   Extraterritoriality Principle Because It Should Be Read as Limited to
   Transactions that Serve Minnesota Load, which Neither Regulates nor
   Controls Commerce Occurring Wholly Outside the State………………21

   1. The NGEA Does Not Violate the Extraterritoriality Doctrine Because it
    Does Not Have the Practical Effect of Regulating Activity Wholly
    Outside of Minnesota…………………………………………………22

   2. The NGEA Does Not Violate the Extraterritoriality Doctrine Because it
    Does Not Conflict with Legitimate Regulatory Regimes of Other States
    or Have the Potential to Create Conflicts if Other States Were to Adopt
    Similar Legislation……………………………………………………23

CONCLUSION........................................................................................................25

CERTIFICATE OF COMPLIANCE………………………………………… ..........27

CERTIFICATE OF SERVICE…………………………………………………........29

# TABLE OF AUTHORITIES

## CASES

*Alliant Energy Corp. v. Bie,* 330 F.3d 904 (7th Cir. 2003)........................................13

*American Beverage Ass'n v. Snyder*, 735 F.3d 362 (6th Cir. 2012).......................20

*Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, No. 12-56822, 2013 WL 4615131 at *10 (9th Cir. Aug. 30, 2013) .......................... 20, 23

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)........................................ 19, 24

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) 19, 22, 23

*Constr. Materials Recycling Ass'n Issues & Educ. Fund, Inc. v. Burack*, 686 F. Supp. 2d 162 (2010)........................................................................................ 11, 18

*Energy & Env't Inst. v. Epel*, No. 11-cv-00859-WJM-BNB, 2014 U.S. Dist. LEXIS 64285 (D. Colo., May 9, 2014)...........................................................................13

*Granholm v. Heald*, 544 U.S. 460 (2005)...................................................................8

*Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814 (8th Cir. 2001)...............................17

*Healy v. Beer Inst.,* 491 U.S. 324 (1989)........................................................ passim

*Minnesota v. Clover Leaf Creamery*, 449 U.S. 456 (1981).............................. 11, 18

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511, U.S. 93 (1994).................7

*Pike v. Bruce Church, Inc*., 397 U.S. 137 (1970). ....................................................10

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ..... 20, 24

*Voices for Choices v. Illinois Bell Tel. Co*., 339 F.3d 542 (7th Cir. 2003) ...............2

*White Stallion Energy Ctr., LLC. v. EPA*, 748 F.3d 1222 (D.C. Cir. 2014)............14

*Wyoming v. Oklahoma,* 502, U.S. 437 (1992) ...........................................................7

**STATUTES**

Minn. Stat. § 216C.05. ...........................................................................................11

Minn. Stat. § 216H.03. .............................................................................................1

**OTHER AUTHORITIES**

Alexandra B. Klass & Elizabeth Henley, *Energy Policy, Extraterritoriality, and the Dormant Commerce Clause*, 5 San Diego J. of Climate & Energy L. 127 (2014) ...................................................................................................................................20

AWEA, *AWEA U.S. Wind Industry Annual Market Report: Year Ending 2012* 8 (2013). ...............................................................................................................4, 9

AWEA, *Wind Power Benefits* 5 (Feb. 2014) ...........................................................17

CRA, *First Two Loops of SPP EHV Overlay Transmission Expansion :Analysis of Benefits and Costs*...................................................................................................16

Dep't of Energy, Office of Energy Efficiency and Renewable Energy .................16

Dep't of Energy, *Wind Vision* (2014). .....................................................................4

Duke University, Nicholas Institute, *Renewable Energy in the South* ...................16

European Wind Energy Association, *Wind Energy and Electricity Prices: Exploring the 'merit order effect'* ........................................................................16

GE Energy, *New England Wind Integration Study* .................................................16

*Grand River Enterprises. Six Nations, Ltd. v. Beebe*, 574 F.3d 929 (8th Cir. 2009). .................................................................................................................................8

Illinois Power Agency, *Annual Report: The Costs and Benefits of Renewable Resource Procurement in Illinois Under the Illinois Power Agency and Illinois Public Utilities Acts* ...............................................................................................15

Jack L. Goldsmith and Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785 (2001) .........................................................................23

Mass. Exec. Office of Energy and Environmental Affairs, *Recent Electricity Market Reforms in Massachusetts: A Report of Benefits and Costs* ...................16

Nat'l Renewable Energy Lab., *United States – Annual Average Wind Speed at 80m*, nrel.gov (Apr. 1, 2014) ..................................................................................9

NYSERDA ............................................................................................................16

Peter Kind, *Disruptive Challenges: Financial implications and Strategic Responses to a Changing Retail Electric Business,* Edison Electric Institute, Jan. 2013 .....................................................................................................................15

SEIA, *State solar Policy: Illinois* .............................................................................9

Solar Market Insight Report 2014 Q2 Executive Summary ......................................5

Synapse Energy, *The Potential Rate Effects of Wind Energy and Transmission in the Midwest ISO Region* ........................................................................................16

Union of Concerned Scientists, *Renewable Electricity Standards at Work in the States* ........................................................................................ 12, 13

## STATEMENT OF INTERESTS

Pursuant to Fed. R. App. P. 29, the American Wind Energy Association (AWEA) and the Solar Energy Industries Association (SEIA), together "the Amici," respectfully submit this brief as *amici curiae* in support of Defendant-Appellees Beverly Heydinger, *et al*. The Amici share a common interest in assuring that the Next Generation Energy Act's (NGEA)[1] provisions at issue here are both upheld as constitutional and interpreted narrowly as regulating only long-term power purchase agreements. If the interpretation of the lower court were affirmed and broadly construed, it would impair interstate and intrastate commerce in renewable energy, impair States' traditional right to regulate energy procurement by utilities in their States, and hinder the progress that states have already made in reducing their carbon footprint in a cost-effective manner and reversing the effects of climate change.

AWEA is the national trade association representing a broad range of entities with a common interest in encouraging the deployment and expansion of wind energy resources in the United States. AWEA represents over 1,000 members across all 50 states. AWEA's members include wind turbine manufacturers, component suppliers, project developers, project owners and operators, financiers, renewable energy supporters, utilities, marketers, customers, and their advocates.

---

[1] Minn. Stat. § 216H.03.

The positions expressed herein are the positions of AWEA and not that of any individual member-company.

SEIA is the national trade association of the United States solar energy industry, encompassing all solar technologies, including photovoltaic, concentrated solar power, and solar heating and cooling. Through advocacy and education, SEIA and its 1,000 member companies work to make solar energy a mainstream and significant energy resource by expanding markets, strengthening the industry, and educating the public on the benefits of solar energy. The positions expressed herein are the positions of SEIA and not the positions of any individual member company.

The Amici have filed a motion for leave to file this *amici curiae* brief, to request that this honorable Court reverse the decision of the District Court, because the issues at bar are of exceptional importance to the industries. Courts grant leave to file amici curiae briefs when they will "assist the judges by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Voices for Choices v. Illinois Bell Tel. Co*., 339 F.3d 542, 545 (7th Cir. 2003). Courts are most likely to allow briefs from *amici curiae* that have "a unique perspective or specific information that can assist the court beyond what the parties can provide." *Id*. As representatives of entities participating in interstate commerce in electric power with Minnesota utilities and with missions focused on promoting

the expansion and facilitation of renewable energy resources in the United States, the Amici bring a unique perspective to the potential implications of the panel's ruling and present ideas not found in the parties' briefs.

For the forgoing reasons and based on the documents submitted herewith, the Amici respectfully request that the Court grant the motion for leave to file the accompanying *amici curiae* brief and that the Court consider the accompanying brief as it reviews the Appellants' and Appellees' arguments.

## BACKGROUND

The AWEA 2012 Wind Market Report shows that wind energy was the largest single source of new electric generating capacity in the United States in 2012, accounting for over 42 % of total capacity additions.[2]  In the past five years, 36.5 % of all new energy capacity has been wind power, making it one of the largest new sources of energy in the country, second only to natural gas plants.[3] There are currently 61 gigawatts (GW) of wind energy installed and operating in the United States across 39 states, producing enough electricity to power over 15 million homes.[4]  U.S. electricity demand served by wind energy has tripled since 2008 increasing from 1.5 % of total demand to 4.5 % in 2013.[5]  Minnesota receives 15.7 % of its electricity from wind energy, making it 5th in the nation for percentage of electricity supplied by wind.

Solar energy is also one of the fastest growing sources of energy in the United States today.  The U.S. installed 1,133 megawatts (MW) of solar photovoltaics (PV) in the second quarter of 2014 to total 15.9 GW installed

---

[2] AWEA, *AWEA U.S. Wind Industry Annual Market Report: Year Ending 2012* 8 (2013).  AWEA estimates that an additional 1,084 megawatts of wind capacity were brought online in 2013 and that an additional 12,000 megawatts of capacity were under construction at year's end.
[3] *Id*. at 22.
[4] *Id.* at 6.
[5] Dep't of Energy, *Wind Vision,* xviii (2014).

capacity, enough to power 3.2 million homes.[6] Cumulative operating PV capacity

has now eclipsed the 15 $GW_{dc}$ mark as a result of three consecutive quarters of

more than 1 $GW_{dc}$ installed.[7] Through the first half of 2014, more than a half-

million homeowners and commercial customers have installed solar PV systems.[8]

For the first time ever, more than 100 $MW_{dc}$ of residential PV came on-line in a

single quarter without any state incentive, and 53% of all new electric generating

capacity in the U.S. in the first half of 2014 came from solar.[9]  Currently,

Minnesota has 6 MW of installed solar electric capacity, which makes it 26th in the

nation for installed capacity.

## SUMMARY OF ARGUMENT

Minn. Stat. § 216H.03, subdivisions 3(2) and 3(3) of the NGEA, bans the

construction of new large energy facilities within the state that have large carbon

emissions and prevents utilities from entering into long-term purchase agreements

with such facilities either in-state or out-of-state.  The NGEA is a valid exercise of

traditional state authority to regulate the procurement of electricity to Minnesota

customers.  It protects Minnesota customers by reducing electricity rate risks

associated with future environmental regulation and fossil fuel volatility and by

---

[6] Solar Market Insight Report 2014 Q2 Executive Summary, *available at* http://www.seia.org/research-resources/solar-market-insight-report-2014-q2.
[7] *Id*.
[8] *Id*.
[9] *Id*.

addressing state environmental goals. Further, the NGEA is not discriminatory on its face or in its intent, serves a legitimate state interest, fails to place an undue burden on interstate commerce, and the local benefits of such action greatly outweigh any incidental burden on interstate commerce. Moreover, it does not regulate commerce wholly outside of Minnesota or the price of electricity. In exercising Minnesota's authority over planning and procurement of energy resources of the electric utilities within the state, the NGEA Section 216H.03, subdivision 3, acts to protect the welfare of ratepayers from the financial hazards of dependence on fuels that may become uneconomic in the future and prevent the environmental and public health harms from carbon emissions, while regulating solely intrastate conduct.

Critically, the statute is not intended and does not have the effect of benefitting in-state electricity generators. Instead, it benefits in- and out-of-state renewable and gas generators, while equally burdening in- and out-of-state coal-fired generators. The Commerce Clause is designed to protect the flow of commerce among states, not to protect any particular fuel or technology. The Amici's members, who are engaged in the development and sale of renewable energy in interstate commerce, benefit from the NGEA.

# ARGUMENT

## I. THE NGEA DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE, BECAUSE IT SIMPLY FAVORS ZERO-EMISSION GENERATION OVER FOSSIL FUELS, WHICH DOES NOT DISCRIMINATE AGAINST INTERSTATE COMMERCE.

The NGEA does not violate the dormant Commerce Clause because it is a non-discriminatory exercise of Minnesota's authority to regulate utilities and energy sources used to serve Minnesota customers. The Commerce Clause authorizes the federal government to regulate interstate commerce. U.S. Const., art. I, § 8. In the absence of a conflicting federal statute, the dormant Commerce Clause is an implied limitation on state authority that prohibits states from "discriminat[ing] against or [unduly] burden[ing] the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511, U.S. 93, 98 (1994); *see also Wyoming v. Oklahoma,* 502, U.S. 437, 454 (1992). A statute may be analyzed under the dormant Commerce Clause for: 1) discrimination and 2) whether the burdens on interstate commerce clearly outweigh the purported local benefit. The NGEA passes the dormant Commerce Clause analysis under each of these prongs.

A. The NGEA Does Not Facially Discriminate Against Interstate Commerce Because it Equally Bans Purchases from Both In-State and Out-of-State Sources

A statute can discriminate on its face, in its purpose, or in its effect. *Granholm v. Heald*, 544 U.S. 460, 472 (2005). A statute is considered facially discriminatory when it plainly "accord[s] differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Grand River Enterprises. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009). The NGEA's Section 216H.03 does not facially discriminate, as it does not expressly differentiate between in-state and out-of-state economic interests in a manner that favors in-state interests. Under the NGEA Section 216H.03, subdivision 3(1), construction of "new large energy facilities" within the state are prohibited, which affects only in-state operators and developers, shows no favoritism for in-state generation, and prevents reliance upon new carbon-emitting facilities within the state. Subdivision 3(2) places the same restrictions on utilities serving state load by preventing new power purchase agreements from identically-defined new facilities out-of-state as well. This places in-state and out-of-state "new large energy facilities" on an identical footing with no preference or benefit for in-state facilities, and therefore, does not facially discriminate.

Similarly, the NGEA does not have discriminatory effects on interstate commerce or effectuate a discriminatory purpose. The NGEA does not give

preference to in-state energy producers, but rather it gives preferences to renewable power, regardless of geographic origin.  In fact, Minnesota's statute, by requiring Minnesota utilities to purchase clean power, will likely spur development of other out-of-state resources at the benefit of those out-of-state industries.  For example, Iowa has significant installed and untapped wind power capacity, which produces upwards of 2,000 MW more wind power than Minnesota. [10]  North and South Dakota also have significant available wind power resources, with significantly higher wind speeds at 80 meters above ground (the height of typical wind farm turbines) than Minnesota,[11] as well as more than double Minnesota's geothermal potential.[12]  Additionally, Illinois has significant solar potential and more potential for bio power than anywhere else in the country.[13] Minnesota can, and likely will, use this out-of-state renewable generation to meet the NGEA standards.

---

[10]  AWEA, *AWEA U.S. Wind Industry Annual Market Report: Year Ending 2012* 8 (2013).

[11] Nat'l Renewable Energy Lab., *United States – Annual Average Wind Speed at 80m*, nrel.gov (Apr. 1, 2014), *available at*  http://www.nrel.gov/gis/images/80m_wind/USwind300dpe4-11.jpg.

[13] SEIA, *State solar Policy: Illinois*, *available at* http://www.seia.org/state-solar-policy/illinois (last visited Nov. 12, 2014).

B. The NGEA Does Not Violate the Dormant Commerce Clause Because It Satisfies the *Pike* Test And Regulates Even-Handedly to Effectuate a Legitimate State Interest and Any Incidental Burdens Are Outweighed by Numerous Local Benefits.

The NGEA does not violate the dormant Commerce Clause because it regulates even-handedly to effectuate Minnesota's legitimate state interests in reducing carbon emissions. Any incidental burdens placed on producers of fossil fuels are outweighed by the numerous local benefits and the benefits provided to out-of-state producers of clean energy. When a statute does not facially discriminate against interstate commerce, courts analyze it under the *Pike* balancing test. Under *Pike*, a facially-neutral statute that "effectuate[s] a legitimate local public interest" and has only an incidental "effect[] on interstate commerce" will "be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).

1. The NGEA Furthers Legitimate Environmental Protection, Health, and Safety Interests.

The NGEA does not violate the dormant Commerce Clause because Minnesota has compelling and legitimate state interests in environmental protection and the health and safety of its citizens. Environmental protection and the health and safety of citizens within the state have been determined to be legitimate local interests. *See, e.g., Minnesota v. Clover Leaf Creamery*, 449 U.S.

456, 473 (1981) (finding the burden on out-of-state industry not excessive "in light of the substantial state interest in promoting conservation of energy and other natural resources"); *Constr. Materials Recycling Ass'n. Issues & Educ. Fund, Inc. v. Burack*, 686 F. Supp. 2d 162, 167 (2010) (upholding statute that banned combustion of waste in state because it promoted "local renewable fuels" that could "improve air quality and public health[] and mitigate against … risks of climate change").

The NGEA was enacted in response to Minnesota's desire for clean energy to protect the state's environment, ensure the health and safety of its citizens, and address climate change by limiting its greenhouse gas emissions.[14] The NGEA empowers Minnesota with the ability to curtail emissions from new large fossil powered sources, ensure local long-term price stability, and prepare for compliance with federal clean-air regulations through the State regulation of electric resource acquisition by utilities in the State. These environmental and health concerns fall squarely within "the substantial state interest in promoting conservation of energy and other natural resources." *Minnesota,* 449 U.S. at 473.  Further, courts defer to local and state legislative findings when determining putative local benefits unless the facts "could not reasonably be conceived true by the decision maker." *Minnesota,* 449 U.S. at 463, n.7, 471, n. 15.

---

[14] *See* Minn. Stat. § 216C.05.

### a. States Across the Country Have Enacted Laws Regulating the Carbon Emissions of their Utilities' Energy Acquisition.

Minnesota's NGEA is merely one example of state legislation used to reduce carbon emissions. For over thirty years, states have enacted various laws to limit carbon emissions and to reduce price volatility from fossil fuels. Examples include renewable portfolio standards (RPSs) (such as Oregon's renewable energy certificates), trading programs (such as California's AB 32 Cap and Trade Program), and incentive programs (such as Texas' property tax incentives). Emissions reductions statutes will continue to be a primary driver for new renewable energy generation and a means to reduce carbon emissions from electric utilities throughout the United States.[15]

These types of statutes are particularly important for the wind and solar industries. The renewable energy production resulting from state renewable energy goals in place today will contribute to annual carbon emission reductions of more than 183 million metric tons by the year 2025.[16] Moreover, half of all U.S. wind development between 2001 and 2006 resulted from state standards.[17] Minnesota, in particular, currently generates 18 % of its electricity from renewable generation, which is well above the regional average of 15 %. Of this renewable

---

[15] Union of Concerned Scientists, *Renewable Electricity Standards at Work in the States*, available at http://www.ucsusa.org/clean_energy/smart-energy-solutions/increase-renewables/renewable-electricity-1.html (last visited Nov. 210, 2014).
[16] *Id.*
[17] *Id.*

generation, Minnesota's electric utilities have acquired more than 1,800 MW of wind and bioenergy as a direct result of their requirements.[18] In addition, Minnesota recently instituted a series of policies including solar requirements in its RPS that are important drivers for Minnesota's burgeoning solar market.

Because federal courts have found that these emissions reduction laws, which increase states renewable energy generation, serve legitimate state interests,[19] so, too, should Minnesota's creation of the NGEA because it serves the same carbon reduction goal. The purpose of the NGEA is to ensure that utilities are not making long-term commitments to energy sources that emit high levels of carbon. It seeks to increase and utilize renewable energy. The state has a legitimate interest in promoting the use of clean energy and protecting its environment, and the NGEA is the manifestation of that interest.

### b. Construction of New Large Fossil Fuel Facilities Will Create Stranded Assets and Harm Ratepayers.

States have a legitimate interest in protecting the welfare of ratepayers through the regulation of public utilities. *Alliant Energy Corp. v. Bie,* 330 F.3d 904 (7th Cir. 2003). During the legislative history of the NGEA, the Minnesota legislature heard testimony concerning the financial costs and risks for utility

---

[18] *Id.*

[19] *See Energy & Env't Inst. v. Epel*, No. 11-cv-00859-WJM-BNB, 2014 U.S. Dist. LEXIS 64285 (D. Colo., May 9, 2014).

ratepayers associated with electricity production from new large fossil fuel-powered facilities. The drafting of the NGEA Section 216H.03, subdivision 3, is designed as a means to protect ratepayers from paying for new fossil powered large facilities which may become expensive or obsolete due to regulatory changes—much as occurred during the 1980s with large nuclear investments. Appx. 116, 119-20 (House committee hearing transcript).

Construction of new fossil fuel-powered large facilities amidst a climate of stricter emissions limits is likely a poor financial decision that may produce stranded assets.[20] Alongside expansion of renewable energy, the EPA has promulgated regulations regarding the emitting of mercury and other air toxins that directly impact carbon emitting generating plants and make operation of such plants more costly.[21] Final regulations on carbon emissions from existing fossil fuel electric plants are currently in the development process by the EPA and are expected to have a large impact on fossil powered generation.[22] Reports from the Edison Electric Institute, the trade association for all investor-owned utilities, have

---

[20] Stranded assets are generation resources, which, as a result of changes in the market and regulatory environment, are no longer able to earn an economic return at some time prior to the end of their economic life (as assumed at the investment decision point).

[21] *See* EPA, Reconsideration of Certain Startup/Shutdown Issues: National Emission Standards for Hazardous Air Pollutants From Coal and Oil Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generation Units, 78 Fed. Reg. 38001 (June 25, 2013); *White Stallion Energy Ctr., LLC. v. EPA*, 748 F.3d 1222 (D.C. Cir. 2014).

[22] Carbon Pollution Guidelines for Existing Power Plants: Emission Guidelines for Greenhouse Gas Emissions From Existing Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34829 (June 18, 2014)

recognized the potential for stranded fossil-powered assets due to the growth of renewable and distributed generation.[23]

By requiring utilities to acquire more electricity from zero-carbon generation, Minnesota is thus ensuring rate stability, fairness, and foresight. Failure to prevent new construction of and long-term purchase agreements from large facilities would be detrimental to the state because the financial burden of these facilities will fall upon the ratepayers should the facilities become stranded assets due to broader state and federal efforts to reduce air pollution.

Currently, new wind power generation is cheaper than new coal generation and it also ensures stable energy prices and resource supply, in contrast to coal's seasonal and market price fluctuations.[24] As of 2014, wind energy is the most affordable source of new electric generation, even absent a consideration of incentives.[25] Dozens of studies confirm the finding that wind energy drives electricity prices down.[26]

---

[23] *See* Peter Kind, *Disruptive Challenges: Financial implications and Strategic Responses to a Changing Retail Electric Business,* Edison Electric Institute, Jan. 2013, *available at* http://www.eei.org/ourissues/finance/documents/disruptivechallenges.pdf.

[24] Lazard, *Levelized Cost of Energy Analysis – Version 8.0* (2014), *available at* http://www.lazard.com/PDF/Levelized %20Cost %20of %20Energy %20- %20Version %208.0.pdf.

[25] *Id*. Wind's range of costs is primarily due to regional variations in wind plant capacity factor and installed costs for wind. The dot at $162/MWh in the image represents offshore wind.

[26] *See, e.g.,* Illinois Power Agency, *Annual Report: The Costs and Benefits of Renewable Resource Procurement in Illinois Under the Illinois Power Agency and Illinois Public Utilities Acts*, *available at* http://www2.illinois.gov/ipa/Documents/April-2012-Renewables-Report-3-26-AAJ-Final.pdf; Mass. Exec. Office of Energy and Environmental Affairs, *Recent Electricity Market Reforms in Massachusetts:*

Similar cost declines have fueled the solar industry's rapid expansion. Solar energy is already a cost-competitive emissions reduction technology and costs continue to decline rapidly. As of Q2 2014, the cost to install solar PV distributed generation dropped by 8% from 2013 levels and 39% from 2010. Experts anticipate a continuation of cost decline as economies of scale are achieved; for example, the Department of Energy (DOE)'s SunShot Vision study predicts that solar technology installed system prices will decline significantly.[27]

In addition to its current affordability, contracted renewable energy is guaranteed to remain affordable tomorrow because it offers the stability of a long-term fixed energy price for 10-30 years due to free renewable fuel. Utility ratepayers typically bear the costs of fuel volatility as a pass-through in power

*A Report of Benefits and Costs*, *available at* http://www.mass.gov/eea/docs/doer/publications/electricity-report-jul12-2011.pdf; European Wind Energy Association, *Wind Energy and Electricity Prices: Exploring the 'merit order effect'*, *available at*
http://www.ewea.org/fileadmin/ewea_documents/documents/publications/reports/MeritOrder.pdf (lists 6 studies); CRA, *First Two Loops of SPP EHV Overlay Transmission Expansion :Analysis of Benefits and Costs*, *available at* http://www.crai.com/uploadedFiles/renewable
energyLATING_MATERIALS/Publications/BC/Energy_and_Environment/files/Southwest %20Power %20Pool %20Extra-High-Voltage %20Transmission %20Study.pdf;
Synapse Energy, *The Potential Rate Effects of Wind Energy and Transmission in the Midwest ISO Region*, *available at* http://www.synapse-energy.com/Downloads/SynapseReport.2012-08.EFC.MISO-T-and-Wind.11-086.pdf; Duke University, Nicholas Institute, *Renewable Energy in the South*, *available at* http://s3.amazonaws.com/zanran_storage/www.seealliance.org/ContentPages/824124081.pdf;
NYSERDA, *available at* http://www.nyserda.ny.gov/Publications/Program-Planning-Status-and-Evaluation-Reports/Renewable-Portfolio-Standard-Reports.aspx; GE Energy, *New England Wind Integration Study*, *available at*
http://variablegen.org/wp-content/uploads/2013/01/newis_report.pdf.

[27] Dep't of Energy, Office of Energy Efficiency and Renewable Energy, *available at $1/W Photovoltaic Systems*, http://www1.eere.energy.gov/solar/sunshot/pdfs/dpw_white_paper.pdf.

purchase agreements or utility ownership of generation assets. This is a major

contrast to the volatile prices that can characterize non-renewable fuels.[28]

Finally, wind and solar energy avoid significant infrastructure costs such as

pipeline investment, coal transport or the associated production and processing

infrastructure needed by coal and gas industries. These cost savings will expand

over time as the energy infrastructure of the U.S. ages and requires more repairs

and replacement.

### 2. Any Incidental Burden on Out-of-State Carbon-Emitting Energy Producers is Dwarfed by the Opportunity for Out-of-State Clean Energy Producers.

The NGEA does not place an unlawful burden on out-of-state industry

because any impacts on out-of-state facilities pale in comparison to the increased

opportunities for out-of-state clean energy producers. Burdening one out-of-state

interest in favor of another out-of-state interest is not a violation of the dormant

Commerce Clause. *See Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 819 (8th

Cir. 2001) (finding no undue burden from a Missouri statute regulating the price of

Missouri livestock because "packers can just as easily purchase Nebraska or

Kansas livestock for slaughter if they do not purchase Missouri livestock"). The

---

[28] Many utilities acknowledge the affordability of wind energy, *see* AWEA, *Wind Power Benefits* 5 (Feb. 2014), http://awea.files.cms-plus.com/AWEA %20White %20Paper-Consumer %20Benefits %20final.pdf.

loss of profit by out-of-state businesses is an insufficient burden, "especially [in cases] . . . where the legislation at issue is reasonably targeted at important public health and environmental concerns." *Constr. Materials Recycling Ass'n Issues,* 686 F. Supp. 2d at 173; *see also Minnesota*, 449 U.S. at 474 (holding that a statute is not invalid "simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry").

Because Minnesota has fewer resources for producing renewable energy than many of its neighboring states, Minnesota will likely continue to meet its demand for clean energy through out-of-state purchases. A *Pike* analysis must examine both burdens on out-of-state carbon-emitting generation and the opportunities provided to all out-of-state electricity generation. Out-of-state wind, solar, biomass, and geothermal all stand to benefit significantly from the NGEA.

## II. THE EXTRATERRITORIALITY PRINCIPLE DOES NOT APPLY TO THE NGEA, AND EVEN IF IT DID, THE NGEA DOES NOT VIOLATE THE DOCTRINE.

The extraterritoriality principle of the dormant Commerce Clause provides that a state may not enact a law that regulates commerce beyond its borders or controls the conduct of those engaged in commerce wholly outside the state. *See Healy v. Beer Inst.,* 491 U.S. 324, 332, 337 (1989). The Supreme Court has only invalidated three laws under the extraterritoriality doctrine. *See Healy*, 491 U.S. at 340; *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573

(1986) [hereinafter "*Brown-Forman*"]; *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S.

511 (1935). These cases hold that a state may not enact a statute that has the

practical effect of requiring other states to adopt similar pricing structures. *See*

*Healy*, 491 U.S. at 336. The extraterritoriality principle should not be applied to

NGEA because: 1) it should not be extended beyond current jurisprudence to apply

to energy policies; and 2) the NGEA does not satisfy the high threshold for

illegality under the extraterritoriality principle.

A. The Extraterritoriality Principle Should Not Be Applied to the NGEA
   Because it Should Not Be Extended Beyond Current Jurisprudence to
   Apply to Energy Policies and the NGEA Does Not Regulate Any Out-Of-
   State Pricing.

   The dormant Commerce Clause only precludes "the application of a state

statute to commerce that takes place *wholly outside* of the State's borders, whether

or not the commerce has effects within in the state." *Id.* at 336 (emphasis added).

The extraterritoriality doctrine is only appropriate in very limited circumstances,

which do not apply to the NGEA.

   The extraterritoriality doctrine has only been used to invalidate statutes that

have shown economic protectionism.  *See e.g., Healy*, 491 U.S. at 336

(invalidating a state statute that required out-of-state shippers of beer to ensure

Connecticut prices were no higher than bordering states); *Brown-Forman*, 476 U.S.

at 573 (invalidating a statute that prohibited distillers from selling to in-state

wholesalers at a price higher than the lowest prices charged out-of-state).  *See also American Beverage Ass'n v. Snyder*, 735 F.3d 362, 377 (6th Cir. 2012) (Sutton, J., concurring) ("I am not aware of a single Supreme Court dormant Commerce Clause holding that relied exclusively on the extraterritoriality doctrine to invalidate a state law.").  The Supreme Court has narrowed the extraterritoriality doctrine further; it has only applied it to invalidate laws that either control wholly out-of-state transactions or dictate the price of a product.  *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, No. 12-56822, 2013 WL 4615131 at \*10 (9th Cir. Aug. 30, 2013) [hereinafter *AECOQ*].

For these reasons, scholars have observed that "the extraterritoriality doctrine should not invalidate the state's energy policy decisions even if it results in adverse economic impacts on some out-of-state actors so long as the state law does not attempt to regulate wholly out-of-state transactions."  Alexandra B. Klass & Elizabeth Henley, *Energy Policy, Extraterritoriality, and the Dormant Commerce Clause*, 5 San Diego J. of Climate & Energy L. 127, 182 (2014) (citing *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1104 (9th Cir. 2013).

Here, the District Court erred when it equated regulation of electricity contracts between in-state utilities and out-of-state electricity producers with regulation of the electricity grid. Although electricity produced out-of-state and sold elsewhere flows through the grid, the necessary interstate transit does not

make any regulation of electricity purchases by in-state utilities *de facto* extraterritorial regulation. The NGEA does not require any out-of-Minnesota entity to build any particular type of electricity plant, generate electricity from a particular technology, or sell to Minnesota. Instead, non-Minnesota entities can make the same voluntary choices available to in-state entities that desire to sell to Minnesota utilities. The NGEA does not say anything about, for example, the generation of electricity in North Dakota for North Dakota residents or sale to non-Minnesota states.

In short, the extraterritoriality doctrine should not be applied to the NGEA because it does not regulate or control price wholly outside of Minnesota and state energy regulation is not *de facto* subject to extraterritoriality analysis based merely on the interstate nature of the electricity grid.

B. <u>The NGEA Does Not Satisfy the High Threshold for Illegality under the Extraterritoriality Principle Because It Should Be Read as Limited to Transactions that Serve Minnesota Load, which Neither Regulates nor Controls Commerce Occurring Wholly Outside the State</u>

Even if the Court applies the extraterritoriality doctrine, the NGEA does not fall within one of the rare instances where the doctrine invalidates a statute. A statute violates the extraterritoriality doctrine when it: 1) has the practical effect of regulating activity wholly outside the state's borders regardless of the legislative intent, and 2) conflicts with other states' legitimate regulatory regimes or has the

potential to create conflicts if other states were to adopt similar legislation.  *See*

*Healy*, 491 U.S. at 335-38.

## 1. The NGEA Does Not Violate the Extraterritoriality Doctrine Because it Does Not Have the Practical Effect of Regulating Activity Wholly Outside of Minnesota.

A statute violates the extraterritoriality principle if it has the practical effect

of regulating an activity that only occurs outside of the state's borders. *See, e.g.,*

*Brown-Forman,* 476 U.S. at 575, 581-85  (invalidating a New York statute, which

required liquor producers selling within New York to price the liquor "no higher

than the lowest price the distiller charges" elsewhere, because the practical effect

of the statute regulated out-of-state prices).

For example, the Supreme Court invalidated a Connecticut liquor price

affirmation statute that required out-of-state shippers to "affirm that their prices are

no higher than the prices being charged in the border States as of the moment[.]"

*Healy*, 491 U.S. at 335.  The Court reasoned that the statute "had the practical

effect of controlling Massachusetts prices" because it "'prospectively' preclude[d]

the alteration of out-of-state prices after the moment of affirmation. *Id.* at 337-38.

Here, the NGEA does not have the practical effect of regulating activity

wholly outside of Minnesota because its scope is limited to contracts that involve

at least one in-state entity[29] and it does not regulate or control pricing wholly outside of Minnesota.  Whereas the New York statute at issue in *Brown-Forman* regulated price in other states, the NGEA only applies to contracts for power to be consumed in Minnesota and does not regulate, or have the effect of regulating, the price of electricity.  *See Brown-Forman*, 476 U.S. at 582-83.  Accordingly, the NGEA does not have the practical effect of extraterritorial regulation.

> 2.  <u>The NGEA Does Not Violate the Extraterritoriality Doctrine Because it Does Not Conflict with Legitimate Regulatory Regimes of Other States or Have the Potential to Create Conflicts if Other States Were to Adopt Similar Legislation.</u>

Part of the extraterritoriality analysis involves "considering how the challenged statute may interact with the legitimate regulatory regimes of other states and what effect would arise if not one, but many or every, state adopted similar legislation." *Healy*, 491 U.S. at 336.  "[T]he [Supreme] Court has never invalidated a state or local law under the dormant Commerce Clause based upon mere speculation about the possibility of conflicting legislation." *AECOQ*, 2013 WL 4615131 *10.[30]

---

[29] The NGEA is limited to contracts for power *imported and consumed* in Minnesota.  *See* Minn. Stat. § 216H.03

[30] The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Healy,* 491 U.S. at 348; Jack L. Goldsmith and Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 806 (2001) ("The fact that a state regulation of cross-border harms has an impact on out-of-state actors cannot by itself be the touchstone for illegality under the extraterritorial-regulation strand of analysis.").

A statute does not automatically conflict with other states' regulations, or risk conflicts with potential legislation, because it is different; states may impose requirements that out-of-state entities must meet before making in-state sales. *See Rocky Mountain Farmers Union*, 730 F.3d at 1104 (citing *Baldwin*, 294 U.S. at 524) ("Firms in any location may elect to respond to the incentives provided by the [California Lower Carbon] Fuel Standard if they wish to gain market share in California, but no firm must meet a particular carbon intensity standard, and no jurisdiction need adopt a particular regulatory standard for its producers to gain access to California.").

The NGEA is unlike *Healy* where the statute directly placed a limitation, by way of a price cap, on the pricing structure in a neighboring state that limited the neighboring state's ability to enforce its own laws and would result in "price gridlock" if other states adopted similar regulations. *See Healy*, 491 U.S. at 340. Other states retain complete freedom to regulate the purchases of electric power by their utilities.

Accordingly, the NGEA does not conflict with existing and longstanding electricity sector regulations in other states and nothing in the NGEA would create conflicts if other states were to adopt similar statutes.

Because the NGEA does not regulate, or have the practical effect of
regulating, extraterritorially and because it does not conflict with other legislation,
the NGEA does not violate the extraterritoriality doctrine.

## CONCLUSION

For the foregoing reasons, AWEA and SEIA respectfully ask that the Court
to reverse the judgment below.

Dated: November 12, 2014        Respectfully submitted,

AMERICAN WIND ENERGY ASSOCIATION

s/ Gene Grace     .
GENE GRACE, NJ # 43582000
Senior Counsel
ADAM CARLESCO
JULIA DREYER
GARRETT HENDERSON
CATHERINE KARCZMARCZYK, TN # 033380
IRINA SADOVNIC
Legal Fellows
American Wind Energy Association
1501 M St., NW, Suite 1000
Washington, D.C.  20005
Phone: (202) 383-2500
Fax: (202) 290-9404

*Counsel for American Wind Energy Association*

SOLAR ENERGY INDUSTRIES
ASSOCIATION

RICK UMOFF
Counsel
505 9th St. NW, 8th Floor

Washington, D.C.  20005
Telephone: (202) 556-2877
Facsimile: (202) 682-0559
rumoff@seia.org

*Counsel for Solar Energy Industries Association*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,521 words, excluding parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Pursuant to 8th Cir. R. 28A(h)(2), the undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus free.

Dated: November 12, 2014       Respectfully submitted,

/s/ Gene Grace
Gene Grace
American Wind Energy Association
1501 M St., NW, Suite 1000
Washington, D.C. 20005
Phone: (202) 383-2500
Fax: (202) 290-9404
Email: ggrace@awea.org

*Counsel for the American Wind Energy Association*

Rick Umoff
Solar Energy Industries Association

505 9th St. NW Suite 800
Washington D.C. 20004
Telephone: (202) 556-2877
Facsimile: (202) 682-0559
rumoff@seia.org

*Counsel for the Solar Energy Industries
Association*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25, I hereby certify that, on November 10, 2014, I electronically filed the foregoing motion and accompanying proposed *amicus* brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 12, 2014        Respectfully submitted,

/s/ Gene Grace
Gene Grace
American Wind Energy Association
1501 M St., NW, Ste. 1000
Washington, D.C. 20005
Phone: (202) 383-2500
Fax: (202) 290-9404
Email: ggrace@awea.org

*Counsel for the American Wind Energy Association*

Rick Umoff
Solar Energy Industries Association
505 9th St. NW Suite 800
Washington D.C. 20004
Telephone: (202) 556-2877
Facsimile: (202) 682-0559
rumoff@seia.org

*Counsel for the Solar Energy Industries Association*