UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

| | | |
|---|---|---|
| State of North Dakota, *et al.* | ) | |
| | ) | |
| Appellees/Cross-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | Nos. 14-2156 and 14-2251 |
| Beverly Heydinger, Commissioner and Chair, Minnesota Public Utilities Commission, et al. | ) ) ) | |
| | ) | |
| Appellants/Cross-Appellees | ) | |
| | ) | |
| | ) | |

**BRIEF OF AMICI CURIAE AMERICAN COALITION FOR CLEAN COAL ELECTRICITY AND NATIONAL MINING ASSOCIATION IN SUPPORT OF APPELLEES/CROSS-APPELLANTS**

Peter S. Glaser
Patrick F. Hofer
Troutman Sanders LLP
Suite 1000
401 9th Street NW
Washington, DC 20004-2134
(202) 274-2998 (telephone)
(202) 274-2994 (fax)
peter.glaser@troutmansanders.com
patrick.hofer@troutmansanders.com

ATTORNEYS FOR AMICI CURIAE
AMERICAN COALTION FOR
CLEAN COAL ELECTRICITY AND
NATIONAL MINING
ASSOCIATION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ ii

DISCLOSURE STATEMENT ....................................................................iv

STATEMENT OF IDENTITY, INTEREST IN CASE, AND AUTHORITY
     TO FILE ................................................................................................. v

RULE 29(c)(5) STATEMENT ...................................................................vii

INTRODUCTION .......................................................................................1

ARGUMENT ...............................................................................................4

I.     The Import Restriction Will Produce No In-State Benefits ...............4

     A.     The Statute Will Have No Effect Whatsoever on Minnesota's
            Climate Change Concerns ............................................................4

     B.     Impending EPA Regulations Eliminate Whatever Purpose the
            Statute Might Have Served ........................................................ 12

     C.     The Import Restriction Does Not Address Any Valid Economic
            Concerns ..................................................................................... 17

           1.     The Import Restriction Was Adopted Because of Climate
                  Change Concerns, Not Economic Concerns .............................. 17

           2.     Any Economic Rationale for the Import Restriction Must
                  Fall Because Minnesota Has Much Less Intrusive Means of
                  Protecting Legitimate In-State Economic Concerns .................. 21

II.     The Import Restriction Will Seriously Intrude on Interstate Commerce......... 23

     A.     The Import Restriction Will Balkanize Electricity Markets ................... 24

     B.     The Import Restriction Will Interfere with the Regional
            Development and Use of Coal, Thus Increasing Electric Rates ............ 26

     C.     The Import Restriction Will Inhibit Technological Development ........ 30

CONCLUSION ......................................................................................... 33

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a) .......................... 34

CERTIFICATE OF COMPLIANCE WITH LOCAL R. 28A(h)(2) ......................... 35

CERTIFICATE OF SERVICE ................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
476 U.S. 573 (1986) .................................................................................. 2, 25

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) .................................................................................. 21, 23

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ...................................................................................15

*Pike v. Bruce Church Inc.*,
397 U.S. 137 (1970) .....................................................................................2

*Utility Air Regulatory Group v. EPA*,
134 S. Ct. 2427 (2014) ...............................................................................15

**STATUTES**

42 U.S.C. § 7411 .............................................................................................14

42 U.S.C. § 7416 .............................................................................................17

Article V of the Next Generation Energy Act of 2007 ..................................19

Minn. Stat. §§ 216B.02, subdiv. 4, 216B.03, 216B.16, 216B.2422, subd. 2 ...................22

Minn. Stat. § 216H.02, subdiv. 1 ............................................................... 1, 19

Minn. Stat. § 216H.02, subdiv. 4, subsec. 3 ....................................................20

Minn. Stat. § 216H.03, subdiv. 2, subdiv. 4, subsec. b ......................................1

Minn. Stat. § 216H.03 subdiv. 3, subsec. 1 .....................................................21

Minn. Stat. § 216H.03 subdiv. 3, subsec. 2 ......................................................1

Minn. Stat. § 216H.03 subdiv. 3, subsec. 2-3 ......................................... 21, 22, 25

Minn. Stat. § 216H.07, subdiv. 5, subsec. 6 ....................................................20

Minn. Stat. § 216H.07, subdiv. 3, .................................................................20

# FEDERAL REGISTER NOTICES

68 Fed. Reg. 52,922, 52,928 (Sept. 8, 2003) ...................................................5

73 Fed. Reg. 44,354, 44,367 (July 30, 2008) .................................................4

74 Fed. Reg. 66,496, 66,497 (Dec. 15, 2009) ..............................................5

76 Fed. Reg. 57,106 (Sept. 15, 2011) ...........................................................15

77 Fed. Reg. 9,304, 9,306, Table 2 (Feb. 16, 2012) .....................................15

77 Fed. Reg. at 9,407, 9,418 .........................................................................16

77 Fed. Reg. 22,392, 22,415 (Apr. 13, 2012) ..............................................27

77 Fed. Reg. 62,624, 62,627 (Oct. 15, 2012) ..............................................15

79 Fed. Reg. 1,430 (Jan. 8, 2014) .................................................................14

79 Fed. Reg. 34,830 (June 18, 2014) ......................................................14, 17

79 Fed. Reg. 34,838 .......................................................................................14

79 Fed. Reg. 34,960 (June 18, 2014) ............................................................14

# DISCLOSURE STATEMENT

The American Coalition for Clean Coal Electricity ("ACCCE") is a non-profit, incorporated national trade organization comprised of industries involved in producing electricity from coal. ACCCE's members include coal producing companies, electric utilities that use coal to generate electricity, railroads that transport coal to electric generating stations, and other companies interested in coal-based electric generation. ACCCE has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although ACCCE's individual members have done so.

The National Mining Association ("NMA") is a non-profit, incorporated national trade association whose members include the producers of most of America's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry. NMA has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although NMA's individual members have done so.

/s/ Patrick F. Hofer
Patrick F. Hofer
Troutman Sanders LLP
401 Ninth Street N.W., Suite 1000
Washington, D.C. 20001
202.274.2882
patrick.hofer@troutmansanders.com

Dated: January 27, 2015

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND AUTHORITY TO FILE

This amicus brief is submitted by the American Coalition for Clean Coal Electricity ("ACCCE") and the National Mining Association ("NMA") (collectively "Clean Coal Amici"). ACCCE is a non-profit, incorporated national trade organization comprised of industries involved in producing electricity from coal. ACCCE's members include coal producing companies, electric utilities that use coal to generate electricity, railroads that transport coal to electric generating stations, and other companies interested in coal-based electric generation. ACCCE's purpose is to advocate on behalf of coal-based electricity in legislative, regulatory and judicial forums and before the public.

NMA is a non-profit, incorporated national trade association whose members include the producers of most of America's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry. NMA members include companies that generate electricity from coal. NMA's purpose is to advocate the interest of its members in legislative, regulatory and judicial forums and before the public.

As discussed in more detail below, this case concerns the constitutionality of a provision of law designed to limit or prevent the importation into Minnesota of out-

of-state coal-fueled electricity.  These cases therefore directly affect ACCCE, NMA, and their members.

Counsel for the parties have informed counsel for Clean Coal Amici that they do not oppose the filing of this amicus brief.

# RULE29(c)(5) STATEMENT

No party's counsel authored this brief in whole or in part.

No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.

No person, other than the amici curiae, contributed money that was intended to fund preparing or submitting this brief.

# INTRODUCTION

Minn. Stat. § 216H.03 subdiv. 3, subsec. 2 (hereafter the "Import Restriction")

prohibits importing electricity into Minnesota from new large energy facilities that

contribute to what Minnesota defines as statewide power sector carbon dioxide

("$CO_2$") emissions.  Because the statute exempts intermediate and peaking facilities

that use natural gas as a fuel, the statute's burden falls largely, if not exclusively, on

coal-fueled facilities (because oil is no longer used for new large electric generation

stations).  Under the Import Restriction, an entity within Minnesota could import

coal-fueled electricity from a new facility only if it incurs a significant penalty.  It must

reduce its own $CO_2$ emissions by an equivalent amount or purchase an allowance or

offset representing an equivalent $CO_2$ emissions reduction by a third party, to the

extent that is possible under the statute's particular requirements.  Alternatively, the

facility from which it seeks to import electricity must capture its $CO_2$ emissions and

store the emissions in an underground geologic formation.[1]  The Import Restriction

was adopted to further the stated goal of steeply reducing Minnesota's overall

greenhouse gas ("GHG") emissions – by at least 15 percent below 2005 levels by

2015, at least 30 percent below 2005 levels by 2025, and at least 80 percent below

2005 levels by 2050.[2]

---

[1] Minn. Stat. § 216H.03, subdiv. 2, subdiv. 4, subsec. b.
[2] Minn. Stat. § 216H.02, subdiv. 1.

The Import Restriction, however, cannot survive under the Commerce Clause. As set forth in the parties' briefs, Commerce Clause analysis requires a balancing of the effects a state law has on interstate commerce with the local benefits the law may produce. Some state laws have such an intrusive effect on interstate commerce that they are considered to be "*per se*" or "virtually *per se*" violations of the Commerce Clause, and almost no local benefit will justify the law's survival.[3] Laws that regulate commerce evenhandedly are permissible but not if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[4]

The brief of Appellees/Cross-Appellants addresses the reason the Import Restriction is a *per se* Commerce Clause violation. Clean Coal Amici show that, even if the Import Restriction could survive *per se* analysis, it must fail under *Pike* balancing because the in-state benefits are essentially meaningless whereas the effect on interstate commerce is extreme.

The local benefits that the statute may theoretically produce are so insignificant as to be immeasurable. Whatever global climate changes may be underway, and whatever role mankind may have in any such climate changes, the GHG emission reductions that the Import Restriction may create are vanishingly small as compared with worldwide GHG emissions. The Import Restriction therefore cannot improve the climate in Minnesota or slow whatever changes may be occurring. Moreover, the

---

[3] *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).

[4] *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970).

U.S. Environmental Protection Agency ("EPA") has begun a program of regulating GHG emissions in the electric power sector that renders the Import Restriction unnecessary and even counterproductive.

In contrast, the Import Restriction will seriously affect interstate commerce. If the Import Restriction is allowed to stand, the precedent will be set for other states to install similar barriers preventing the import into their states of disfavored sources of electricity. The result will be a balkanization of the electric grid that will be inefficient, that will increase costs to consumers, and that contradicts explicit national energy policy. Moreover, coal has long been the leading fuel for the production of electricity in the Upper Midwest, the United States, and indeed across the world. To decree that Minnesota can essentially ban the importation of new coal-generated electricity is to sharply restrict the supply of electricity that can enter the state, adversely affect the market for electricity in the entire interconnected region, and raise costs for business and residential consumers. Finally, preventing the construction of new coal generating facilities will also impede developing new coal-based technologies that can lower GHG emissions.

For these reasons, the Import Restriction violates the Commerce Clause and should be struck down.

**ARGUMENT**

**I.    The Import Restriction Will Produce No In-State Benefits.**

**A.    The Statute Will Have No Effect Whatsoever on Minnesota's Climate Change Concerns.**

GHGs are unlike other pollutants because they mix and are transported in the global atmosphere. As a result, global atmospheric levels of GHGs are essentially the same worldwide. Thus, a ton of $CO_2$ emitted in, for instance, North Dakota has the same effect on global GHG concentrations as a ton emitted in China. Carbon dioxide emissions in North Dakota, thus, do not produce unique effects in Minnesota or the Midwest or the United States. Any ton of GHGs emitted anywhere in the world has the same effect as any other ton emitted anywhere else in the world in whatever climate effects global atmospheric GHGs may be producing.[5]

GHGs are also unlike most traditional types of pollutants in that most traditional pollutants are emitted by a relatively limited number of sources, whereas GHGs are emitted by a large and diverse number of sources. The most ubiquitous GHG – $CO_2$ – is the inevitable byproduct of combusting fossil fuels (oxidizing carbon). In the United States, more than eighty percent of energy is derived from the combustion of fossil fuel.[6] As a result, according to EPA, "[v]irtually every sector of

---

[5] EPA, Regulating Greenhouse Gas Emissions under the Clean Air Act, 73 Fed. Reg. 44,354, 44,367 (July 30, 2008).

[6] *EIA's Energy in Brief: What are the major sources and users of energy in the United States?* http://www.eia.gov/energy_in_brief/article/major_energy_sources_and_users.cfm (last updated Aug. 1, 2013).

the U.S. economy is either directly or indirectly a source of GHG emissions."[7]  As the

Intergovernmental Panel on Climate Change ("IPCC"), a source on which the EPA

relies extensively in its climate change analyses,[8] has noted, "[e]missions of GHGs are

associated with an extraordinary array of human activities."[9]

Given this context, the Import Restriction cannot meaningfully affect global

GHG concentrations or possible climate change.  A new large coal-burning electric

generation facility, for instance, produces about 5 million tons per year of $CO_2$.[10]

Global GHG emissions in $CO_2$ equivalent in 2010 were about 50,000 million metric

tons.[11]

Yet even this comparison does not capture the truly insignificant impact the

Import Restriction will have.  Global GHG emissions are projected to rise

significantly in the future even as U.S. and other developed countries' GHG emissions

remain flat or decline.  Worldwide economic development is spurring an explosion in

---

[7] EPA, Control of Emissions from New Highway Vehicles and Engines, 68 Fed. Reg. 52,922, 52,928 (Sept. 8, 2003).

[8] EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,497 (Dec. 15, 2009).

[9] IPCC, *Climate Change 2001*: *Mitigation* ("IPCC 2001") 608 (2001), *available at* http://www.grida.no/publications/other/ipcc_tar/ (last visited Sept. 17, 2013).

[10] For instance, the 600 MW Big Stone II coal-fueled generating unit that a consortium of utilities had been pursuing in South Dakota would have emitted 4.7 million tons of $CO_2$.  Testimony of Ward Uggerud, Minnesota Public Utility Commission Docket No. CN-05-619, Dkt #3107117, June 1, 2006, at 22.

[11] United Nations Environment Programme, *The Emissions Gap Report 2012: A UNEP Synthesis Report*, Nov. 2012 at 1, http://www.unep.org/pdf/2012gapreport.pdf.  A metric ton is 2,204.6 pounds.

global demand for energy, as the rest of the world tries to catch up to Western standards of living. For instance, the average consumer in the United States uses 13,395 kWh of power each year.[12] The average Indian uses just 626 kWh.[13] In India, more than 400 million people have no electricity, 600 million cook with wood or dung, and more than 900 million have no refrigeration.[14] The implications of these statistics for future world energy use – and GHG emissions – are stark.

In fact, the developing world is rapidly increasing its coal use. According to the International Energy Agency ("IEA"), an organization comprised of 28 member countries, including the United States, "[c]oal has met nearly half of the rise in global energy demand over the last decade, growing faster even than total renewables . . . . The policy decisions carrying the most weight for the global coal balance will be made in Beijing and New Delhi – China and India account for almost three-quarters of projected non-[Organisation for Economic Co-Operation] coal demand growth (OECD coal use declines)." The IEA goes on to say that, "***The growth in China's electricity demand over the period to 2035 is greater than the total current electricity demand in the United States and Japan.*** China's coal-fired output increases almost as much as its generation from nuclear, wind and hydropower

---

[12] The World Bank, Data: Electric power consumption (kWh per capita), http://data.worldbank.org/indicator/EG.USE.ELEC.KH.PC (2010 data).
[13] *Id.*
[14] IEA, WORLD ENERGY OUTLOOK 574 (2007), http://www.iea.org/publications/freepublications/publications/weo_2007.pdf.

combined."[15]

The effect of this trend on energy usage and GHG emissions is displayed graphically below. Since the mid-1990s, the Asian Pacific region has dominated coal usage.[16]



[rest of page intentionally left blank]

[15] *Id.* at 5, 6.
http://www.iea.org/publications/freepublications/publication/English.pdf (emphasis added).
[16] BP Statistical Review of World Energy, June 2013, at 34,
http://www.bp.com/content/dam/bp/pdf/statistical-review/statistical_review_of_world_energy_2013.pdf.

This disparity is projected to increase even more in the future[17]:



Figure 70. World coal consumption by region, 1980–2040

The same trend is evident in worldwide GHG emissions, as shown in the following two EIA charts,[18] the first displaying relative worldwide GHG emissions by metric tons and the second showing relative emissions by percentages.

[rest of page intentionally left blank]

---

[17] Source: EIA, International Energy Outlook 2013, Figure 70, July 25, 2013, http://www.eia.gov/forecasts/ieo/coal.cfm.
[18] EIA, "Emissions of Greenhouse Gases in the U. S." (Mar. 31, 2011), http://www.eia.gov/environment/emissions/ghg_report/ghg_overview.cfm.

## Figure 6. World carbon dioxide emissions by region, 1990, 2007, 2025, and 2035

billion metric tons carbon dioxide



## Figure 7. Regional shares of world carbon dioxide emissions, 1990, 2007, 2025, and 2035

percent of world total

As can be seen, GHG emissions by industrialized nations are projected to fall, while GHG emissions by industrializing nations will grow.

Moreover, U.S. energy-sector $CO_2$ emissions have been declining, not increasing, and in 2013, even as emission bumped up from 2012 levels, they remained below 2000 levels.[19]



[rest of page intentionally left blank]

<hr/>

[19] EIA, U.S. Energy-Related Carbon Dioxide Emissions, 2012, October 2013 at ii and EIA, Today in Energy, January 13, 2014.

In part, this is because of the 2007-08 recession, but it is also because of a longer-term decoupling of GHG emissions from GDP, such that the "carbon intensity" of the U.S. economy is dramatically improving:



**Percent change in GDP and energy-related carbon dioxide since 1990**

Sources: U.S. Energy Information Administration, *Monthly Energy Review* (July 2012), Table 12.1; Bureau of Economic Analysis, www.bea.gov, as of 7/27/2012.

[rest of page intentionally left blank]

This trend, moreover, is not short-term; domestic energy-related $CO_2$ emissions are projected to remain below 2005 levels through 2040 even without new national GHG regulations.[20]



**Figure 4. U.S. energy-related $CO_2$ emissions, 1990-2040 (billion metric tons)**

In sum, against these national and global trends, the Import Restriction is no more than a gesture by the Minnesota legislature, one that will produce no cognizable in-state benefits.

**B.    Impending EPA Regulations Eliminate Whatever Purpose the Statute Might Have Served.**

Minnesota's perceived need to take action on climate change is also unnecessary given EPA regulatory policy. On June 25, 2013, the President gave a

---

[20] EIA, *Annual Energy Outlook 2013 Early Release Overview* at 3, http://www.eia.gov/forecasts/aeo/er/pdf/0383er(2013).pdf.

major speech[21] announcing his adoption of a detailed 21-page national Climate Action Plan, the goal of which is to reduce domestic GHG emissions by 17 percent below 2005 levels by 2020.[22]  The Plan contains measures for virtually the entire economy but particularly focuses on the electric power sector.  The Plan's power sector measures include provisions for reducing $CO_2$ emissions from electric generating stations, further developing renewable resources, and increased innovation in clean energy.

The President also issued a June 25, 2013 Presidential Memorandum entitled "Power Sector Carbon Pollution Standards," which directs EPA to repropose $CO_2$ performance standards for new electric generation by September 20, 2013.  He also directed EPA to propose $CO_2$ performance standards for modified and reconstructed electric generation by June 1, 2014 and to finalize those standards by June 1, 2015.  Finally, he directed EPA to propose regulations by June 1, 2014 that require states to submit plans by June 30, 2016containing $CO_2$ performance standards for existing electric generation and to finalize those regulations by June 1, 2015.

EPA has proceeded with these regulations by proposing $CO_2$ emissions standards under the Clean Air Act New Sources Performance Standards ("NSPS")

[21] Remarks by the President on Climate Change (June 25, 2013), http://www.whitehouse.gov/the-press-office/2013/06/25/remarks-president-climate-change.

[22] The Executive Office of the President, The President's Climate Action Plan (June 2013) at 4, http://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf.

program, 42 U.S.C. § 7411.  EPA proposed standards for new coal-fueled electric

generators that will require those facilities to capture and store roughly half of their

$CO_2$ emissions.[23]  EPA also proposed standards for modified and reconstructed coal

generators that will also restrict their $CO_2$ emissions.[24]  Most sweepingly, EPA

proposed $CO_2$ emission standards for the entire fleet of existing coal-fueled electric

generators that, by EPA's calculation, will reduce power sector $CO_2$ emissions by 30

percent by 2030, with the large majority of those reductions occurring by 2020.[25]

Under EPA's existing-generator proposal, every state – including Minnesota and all

states capable of exporting electricity into Minnesota – will be given not-to-exceed

budgets for their power sector $CO_2$ emissions starting in 2020 and increasing through

2030.[26]

     The Presidential Memorandum follows on EPA climate change efforts that

were already well underway.  Immediately upon taking office, President Obama's first

EPA Administrator announced that regulating GHGs would be one of her highest

---

[23] Standards of Performance for Greenhouse Gas Emissions From New Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 1,430 (Jan. 8, 2014).  *See also* http://www2.epa.gov/carbon-pollution-standards/fact-sheet-clean-power-plan-overview.

[24] Carbon Pollution Standards for Modified and Reconstructed Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34,960 (June 18, 2014).

[25] Carbon Pollution Emission Guidelines for Existing Stationary Sources:  Electric Utility Generating Units; Proposed Rule, 79 Fed. Reg. 34,830 (June 18, 2014).

[26] *See* 79 Fed. Reg. at 34,830.

priorities.[27]  Since then, EPA announced that it would proceed first against the two

largest GHG-emitting sectors, transportation and electric power, taking advantage of

authority given it under *Massachusetts v. EPA*, 549 U.S. 497 (2007).  *Massachusetts* held

that GHGs are "air pollutants" under the Clean Air Act.  EPA's first round of GHG

regulations following *Massachsuetts* was to set motor vehicle GHG standards and

GHG permitting requirements for new and modified manufacturing and industrial

facilities, including electric generators.[28]  EPA followed up its initial motor vehicle

regulations with phase two regulations for automobiles and light-duty trucks for

model years 2017-25 that will require the equivalent of an average fuel economy of

54.5 miles per gallon by 2025.[29]  EPA similarly adopted GHG standards for heavy-

duty trucks.[30]

      EPA's other power sector regulations, particulary its Mercury and Air Toxics

Standards ("MATS") rule,[31] have also had the effect of reducing power sector $CO_2$

emissions by forcing a wave of coal generator retirements.  The MATS rule went into

---

[27] EPA Administrator Lisa Jackson, Opening Memo to EPA Employees (Jan. 23, 2009), http://blog.epa.gov/administrator/2009/01/26/opening-memo-to-epa-employees/.

[28] *See Utility Air Regulatory Group v. EPA*, 134 S. Ct.  2427, 2444 (2014).

[29] 77 Fed. Reg. 62,624, 62,627 (Oct. 15, 2012).

[30] 76 Fed. Reg. 57,106 (Sept. 15, 2011).

[31] National Emission Standards for Hazardous Air Pollutants From Coal-and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, also known as the "Mercury and Air Toxics Standards or "MATS" rule, 77 Fed. Reg. 9,304, 9,306, Table 2 (Feb. 16, 2012).

effect in April 2012 and requires utilities to comply with stringent standards to reduce haaszardous air pollutants.  Compliance is due in May 2015, with the possibility of a one-year extension until April 2016.[32]  When EPA proposed the MATS rule in 2010, it estimated that there were 317 gigawatts of coal-fueled electricity in the United States.[33]  By the time EPA proposed its $CO_2$ rule for existing coal generators described above, which does not even go into effect until 2020, EPA was estimating that in 2016 (when the MATS rule is fully complied with), only 244 gigawatts of coal generation will remain, a net loss to retirements of 73 gigawatts.[34]  EPA's analysis shows that when the $CO_2$ rule goes into effect in 2020, the remaining amount of coal generation will be reduced to 198 gigawatts, a reduction from the 2010 level of 119 gigawatts, or nearly 40 percent.[35]

Given all of this regulatory activity, there is no need for Minnesota to impose an Import Restriction out of a concern that its neighbors are not doing enough to limit their $CO_2$ emissions from new electric generators.  Under intense regulatory scrutiny, power sector $CO_2$ emissions are already waning.  Moreover, in EPA's rulemaking to restrict existing electric generation $CO_2$ emissions, Minnesota has had

---

[32] 77 Fed. Reg. at 9,407, 9,418.
[33] EPA, MATS Regulatory Impact Analysis, Table 3-8 at 3-19, http://www.epa.gov/mats/actions.html.
[34] See Spreadsheet for the Proposed Clean Power Plan_Base Case_ssr.xlsx, EPA Analysis of the Proposed Clean Power Plan, IPM Run Files, http://www.epa.gov/airmarkets/powersectormodeling/cleanpowerplan.html.
[35] *See* Clean Power Plan Regulatory Impact Analysis, Table 3-12 at 3-34, http://www2.epa.gov/carbon-pollution-standards/clean-power-plan-proposed-rule-regulatory-impact-analysis.

an opportunity to comment on what its neighbors' $CO_2$ budgets should be. Minnesota will also have the discretion to set its own budget for its own in-state facilities at a level that is more stringent than the EPA-set budget level, because the Clean Air Act allows states to exceed federal standards. 42 U.S.C. § 7416. But what Minnesota cannot do is dictate to other states how they generate electricity.

## C. The Import Restriction Does Not Address Any Valid Economic Concerns.

### 1. The Import Restriction Was Adopted Because of Climate Change Concerns, Not Economic Concerns.

Perhaps recognizing the futility of the Import Restriction as a measure for addressing climate change, Appellants/Cross-Appellees' attempt to recast it as a means of addressing both "economic and environmental concerns."[36] The asserted economic justification for the Import Restriction is that the State must plan for the possibility that EPA might in the future adopt power-sector $CO_2$ restrictions.[37] Absent such planning, it is asserted, the state's electricity consumers could become subject to higher rates because EPA $CO_2$ regulation could increase the cost of operation of these out-of-state plants or even prevent or restrict their operation, creating "stranded investment."[38] The fact that EPA has now proposed new $CO_2$ regulations is asserted as evidence of the wisdom of these concerns.[39]

---

[36] Brief of Appellants/Cross-Appellees at 3.
[37] *Id.* 3-4.
[38] *Id.*
[39] *Id.* at 4-5.

17

This economic justification for the Import Restriction, however, does not bear scrutiny. In the first place, as described above, under EPA's proposed $CO_2$ performance standards for new generation, new coal-fueled generators cannot be built unless they meet EPA's $CO_2$ standards. Thus, there is no possibility that Minnesota ratepayers could be forced to bear the cost of facilities that cannot run because of $CO_2$ restrictions; the EPA regulations will require the installation of $CO_2$ controls as a condition of building the facility. If the controls make the facility uneconomic, it will not be built.

More fundamentally, the Appellants/Cross-Appellees are wrong that economic concerns played a meaningful role in animating the Import Restriction. That provision resulted because of concerns about global warming. In support of their contention that the legislation targeted economic as well as environmental concerns, Appellants/Cross-Appellees cite a few snippets of testimony at hearings out of a total of 175 pages of legislative history that the Defendants below supplied to the district court, consisting of the testimony of one witness.[40] In contrast, Appellants/Cross-Appellees cited 18 pages of legislative history as to climate change concerns.[41] Moreover, conspicuously absent from Appellants/Cross-Appellees' argument is any citation of anything *in the legislation itself* that even remotely supports the notion that the Import Restriction was adopted to protect electric consumers against the cost of

---

[40] Brief of Appellants/Cross-Appellees at 3-4.
[41] *Id.* at 4-5.

future GHG regulation, rather than to reduce Minnesota's GHG emissions because of climate change concerns. The Import Restriction is part of Article V of the Next Generation Energy Act of 2007, which is entitled "Global Climate Change; Greenhouse Gas Emissions." The goal of Article V is to reduce *total Minnesota* GHG emissions[42] dramatically – by at least 15 percent below 2005 levels by 2015, at least 30 percent below 2005 levels by 2025, and at least 80 percent below 2005 levels by 2050. Minn. Stat. § 216H.02, subdiv. 1. These goals are plainly directed towards limiting climate change. As Representative Ruud explained at the beginning of the legislative debate:

> So the first part I want to refer to is the section 3 that speaks to the goals. And it establishes three reduction goals. And the first goal, the longest term goal that's out there is 80% that we want to reduce emissions 80% below current levels by 2050. **And this is a number, members, that has been in science and it speaks to what science is telling us that we need to do to avoid dangerous global warming**. The shortest term goal is to reduce to 15% below current levels by 2015, and it is only slightly more aggressive than the Governor's own goal of reducing the State's per capita fossil fuel use by 50% in 2015. And we believe it is a goal very much well worth planning for. And the mid-term goal is to reduce 30% below current levels by 2025. And that's designed to keep us on track. We also ask the stakeholders to work on a plan to get us to 45% of that same year just in case as time marches on, that **science tells us that we need to be more aggressive in this process**.[43]

In accordance with these climate change goals, the legislation provides for the adoption of a "Climate Change Action Plan" under which GHG emissions from

---

[42] As Minnesota defines those emissions, which include emissions that occur outside the State and should be beyond its regulatory control.

[43] Appellants' Appendix at Appx.114 (emphasis added).

19

every sector of the Minnesota economy will be tracked and plans will be developed to reduce those emissions.

Indeed, far from intending to protect electric consumers from the cost of future carbon regulations, the legislature recognized that achieving its GHG goals would entail significant costs. Thus, the legislature directed that the Climate Change Action Plan "assess the costs, benefits, and feasibility" of various options[44] and recognized that achieving its goals could cause "economic dislocation."[45]

And indeed, the state has found that reducing GHG emissions is difficult economically. As the Minnesota Pollution Control Agency and Minnesota Department of Commerce reported to the legislature in their most recent biennial report called for under 216H.07, subdiv. 3:

> A significant reduction in GHG emissions is seen in 2009. The financial crisis led to a contraction of economic production, which had the effect of reducing energy use and greenhouse gas emissions. With economic recovery, emissions rose in 2010.[46]

In sum, the Import Restriction was adopted to achieve climate change, not economic, benefits.

---

[44] Minn. Stat. § 216H.02, subdiv. 4, subsec. 3.
[45] Minn. Stat. § 216H.07, subdiv. 5, subsec. 6.
[46] "Greenhouse Gas Emissions Reduction Biennial Report to the Minnesota Legislature," January 2013, at 1, a*vailable at* http://www.pca.state.mn.us/index.php/view-document.html?gis=18931.

2. **Any Economic Rationale for the Import Restriction Must Fall Because Minnesota Has Much Less Intrusive Means of Protecting Legitimate In-State Economic Concerns.**

It is axiomatic that, under the Commerce Clause, a state must show both that its statute serves a legitimate local purpose and that the purpose could not be served as well by means that do not intrude on interstate commerce.[47] Here, even if Minnesota could show a legitimate concern in protecting its citizens against the cost of future $CO_2$ regulation, it has considerably less intrusive ways of doing so within its traditional regulatory authority.

As noted, Appellants/Cross-Appellees argue that Minnesota's economic concern is to protect Minnesota retail ratepayers from having to bear the costs of so-called "stranded assets." Minnesota has multiple ways of addressing this concern short of the Import Restriction. For instance, it has the authority to ensure that no such assets are developed or expanded within its own borders. Indeed, the NGEA specifically reflects the exercise of that traditional state authority by prohibiting "construct[ion] within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions."[48] Appellees have not challenged that provision of the NGEA, and the District Court did not invalidate that provision or, for that matter, any other part of the entire NGEA other than Minn. Stat. § 216H.03 subdiv. 3, subsec. (2)-(3).

---

[47] *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).
[48] Minn. Stat. § 216H.03 subdiv. 3, subsec. (1).

Further, Minnesota could use it traditional regulatory authority over "public utilities" that serve retail customers in Minnesota to address the possibility of "stranded assets" wherever occurring.[49]   Minnesota may properly exercise review and approval authority over the Integrated Resource Plans these "public utilities" submit, which allows evaluation of whether these utilities are relying on resources during their planning that may become "stranded assets."  Minnesota can also apply its prudency review authority to consider reliance on potentially "stranded assets" when determining the retail rates these "public utilities" may charge to Minnesota consumers.

Apart from pursuing these economic concerns through its traditional regulatory authority, Minnesota could also work cooperatively with other states to develop mutually agreeable and acceptable standards and goals at a regional level.  Indeed, EPA's proposed regulations to reduce $CO_2$ emissions from existing generators encourage states to work together to submit regional plans rather than individual state plans.[50]  Moreover, in November 2007, Minnesota, along with several other states and a Canadian province, signed on to the Midwestern Greenhouse Gas Accord to work toward, among other things, establishing targets for GHG emission reductions and

---

[49] *See, e.g.,* Minn. Stat. §§ 216B.02, subdiv. 4, 216B.03, 216B.16, 216B.2422, subd. 2.
[50] For instance, although EPA's proposal gives states submitting individual state plans one year to submit a plan to EPA, states submitting regional plans would have three years to submit a plan.  79 Fed. Reg. at 34,838.

timeframes, and developing cap-and-trade agreements.[51]  Rather than following

through on this important initiative, Minnesota allowed these efforts to languish.

Instead, Minnesota passed an unconstitutional law that unilaterally imposed its

policies on its neighboring states and their citizens, while interfering with interstate

commerce.

Minnesota's failure to pursue these less intrusive measures dooms § 216H.03

subdiv. 3, subsec. (2)-(3) under the Commerce Clause under *Hughes*.  Indeed, the fact

that Minnesota did not choose these more modest measures demonstrates that its real

intent was not economic but environmental.  Minnesota wanted to prevent

construction of coal plants located not just inside Minnesota but in other states as well

because of a desire to reduce $CO_2$ emissions however it could, even though the state's

effort would merely be symbolic because no meaningful in-state benefit will result.

## II.  The Import Restriction Will Seriously Intrude on Interstate Commerce.

Appellees/Cross-Appellants' brief demonstrates the interstate and regional

nature of the electricity market.  The Import Restriction will impede interstate

commerce by (a) balkanizing electricity markets; (b) interfering with the regional

development and use of coal, which will increase electric rates for all regional

consumers and damage the economies of Minnesota and neighboring states; and (c)

perversely, disincenting the development of new, more efficient, and lower-emitting

coal-fueled electric generation technologies.

---

[51] See http://www.c2es.org/us-states-regions/regional-climate-initiatives/mggra.

## A.      The Import Restriction Will Balkanize Electricity Markets.

If allowed to stand, the Import Restriction will set a precedent that will significantly disrupt the efficient operation of the interstate electricity market. Because of the laws of physics, electricity is the most inherently interstate of any interstate market for any product.  As Appellees/Cross-Appellants' brief shows, because of the unique nature of the interstate electric grid, a high degree of interstate coordination takes place to ensure the grid operates in a reliable and least-cost manner.  Most of the country now has a series of Regional Transmission Organizations and Integrated System Operators that coordinate large regional markets for electric generation and transmission.  These markets allow for the selection of the lowest-cost and most reliable resources to serve ultimate consumers.

These markets cannot work if individual states can wall themselves off from electricity that is produced in a way they disfavor.  As Appellees/Cross-Appellants' brief shows, regional coordinators cannot redirect electricity produced in, for example, North Dakota so that it will be delivered in another state rather than Minnesota.  The power grid doesn't work that way.  Thus, the only way the Import Restriction can work is if new coal generation is not built, because any new regional coal generation will inevitably flow into Minnesota and cause Minnesota utilities to incur significant penalties – in the form of offsets or allowances or reduced generation – that they will be unwilling to bear.  The Import Restriction thus creates a formula or roadmap that can be used elsewhere to enable individual states to veto the types of

facilities that are not to their liking and thereby deprive the regional interstate market of those resources. At the very least, the Import Restriction, by walling off Minnesota from out-of-state coal generation, significantly burdens that generation by limiting access to the Minnesota market.[52]

Interstate electricity markets, however, cannot function with this type of state control. *See Brown-Forman Distillers Corp.*, 476 U.S. at 579 (Commerce Clause analysis involves examining both "the consequences of the statute itself" and "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."). If Minnesota can ban the importation of electricity from new coal generators, then Iowa can ban imported nuclear electricity, and Wisconsin can ban imported hydroelectricity. Indeed, any state could ban imported electricity from any new or even existing facility because the state does not think that the facility

---

[52] The Census Bureau estimates that the population of Minnesota and the four states that border Minnesota (North Dakota, South Dakota, Wisconsin and Iowa) is about 16 million people. *See* http://www.census.gov/popest/data/state/totals/2014/index.html. Since Minnesota comprises about one-third of that population (about 5.5 million people), Minnesota is obviously an important market for power built in this region. For generation located in South Dakota and North Dakota, which will flow east given that the dividing line between the largely electrically disconnected Eastern Interconnection and Western Interconnection is in eastern Montana and the far west of South Dakota, Minnesota is obviously the main market. *See* http://energy.gov/oe/services/electricity-policy-coordination-and-implementation/transmission-planning/recovery-act-0. Thus, the Import Restriction will significantly limit the market for coal power generated in surrounding states.

represents an acceptable form of generation. Interstate electric markets would

collapse under the weight of this type of system.[53]

**B.    The Import Restriction Will Interfere with the Regional Development and Use of Coal, Thus Increasing Electric Rates.**

Minnesota does not produce coal. North Dakota, however, is the nation's

ninth largest coal-producing state.[54] Since North Dakota coal production is used

overwhelmingly for electric generation, and since Minnesota is the largest market for

North Dakota electric generation, the Import Restriction will prevent the

development of North Dakota's coal resources.

---

[53] It is not true, moreover, as the renewable interest Amici claim, that numerous other states have adopted similar restrictions. Amicus Brief of The American Wind Energy Association, *et al.*. at 12. Almost all of the statutes that they cite are renewable resource portfolio standards ("RPS") under which utilities are incentivized and encouraged to purchase a certain percentage of their electricity from renewable generation. Minnesota has itself enacted an RPS statute. See http://www.dsireusa.org/incentives/incentive.cfm?Incentive_Code=MN14R (collecting legislation and MPUC orders creating renewable portfolio requirements). Minn. Stat. § 216H.03 subdiv. 3, subsec. (2)-(3) is materially different from the RPS statutes that have been enacted in various states. RPSs do not prohibit particular types of transactions or the use of particular types of generation sources, whereas § 216H.03 prohibits use of coal-fueled sources by expressly prohibiting specific types of transactions. RPSs are intended to enhance reliability and reduce costs in the long run through diversification by promoting the development of renewable sources as additional available resources. In stark contrast, § 216H.03 seeks to eliminate available resources – and indeed, eliminate what has historically been one of the lowest cost and most reliable generation sources. Thus, § 216H.03 is anti-diversification, anti-reliability, and anti-competitive, in addition to being unconstitutional.

[54] *See* NMA statistics at http://www.nma.org/index.php/coal-statistics/coal-production.

The effect, however, will not be restricted to damaging the market for the production and use of North Dakota coal. The effect will include raising costs to electric consumers both in Minnesota and surrounding states. Because coal has historically been the leading fuel for electric generation in the MISO region,[55] preventing the use of coal for new electric generation will – by the basic law of supply and demand – raise the cost of electricity. Given the regional nature of electricity markets, these increased costs will be experienced throughout the region.

The increased costs could be substantial. For instance, EPA estimates that the cost for a new coal-fired electric generator to capture and store, rather than emit to the atmosphere, its $CO_2$ emissions would increase the cost of its electricity by 80 percent.[56]

These costs will damage Minnesota business. Minnesota is home to many energy-intensive industries: mining, forestry and paper, steel production, manufacturing, and more. For these companies, electricity isn't just a cost of doing business – it can be one of their largest costs.

The increased costs caused by the Import Restriction will also disproportionately harm the poor and those living on fixed incomes because increasing electric rates is akin to imposing a regressive tax. As one study has concluded, GHG regulation:

---

[55] EIA, *Annual Energy Outlook 2013,* http://www.eia.gov/forecasts/aeo/.
[56] 77 Fed. Reg. 22,392, 22,415 (Apr. 13, 2012).

…will impact low income groups, the elderly, and minorities disproportionately, both because they have lower incomes to begin with, but also because they have to spend proportionately more of their incomes on energy, and rising energy costs inflict great harm on minority families. Lower-incomes families are forced to allocate larger shares of the family budget for energy expenditures, and minority families are significantly more likely to be found among the lower-income brackets. This disparity between racial groups means that rising energy costs have a disproportionately negative effect on the ability of minority families to acquire other necessities such as food, housing, childcare, or healthcare.[57]

The number of people who are now vulnerable to increased energy prices is increasing. Poverty rates have increased to historic highs, consistent with the declining long-term trend in family incomes. The number of people in poverty in 2010 was the largest number in the 52 years since the Census Bureau began to publish poverty statistics.[58] Poverty is more prevalent among some minority groups.[59] Some 27% of Blacks and 26% of Hispanics lived in poverty in 2010, compared with 15% for the overall population.[60] Nationally, between 2000 and 2012, the percentage of people in poverty increased from 12.2 percent to 15.9 percent, while the number of people in poverty increased from 33.3 million to 48.8 million.[61] The percentage of people in the United States with income below 50 percent of the poverty thresholds

---

[57] Management Information Services, Inc., *Executive Summary: Potential Impact of the EPA Endangerment Finding on Low Income Groups and Minorities,* March 2010 at 2-3, www.misi-net.com/publications/APA-0310.pdf.

[58] Eugene Trisko, ENERGY COST IMPACTS ON AMERICAN FAMILIES, 2001-2012, Feb. 2012, available at www.americaspower.org.

[59] *Id.*

[60] *Id.*

[61] U.S. Census Bureau, Poverty: 2000 to 2012, Sept. 2013.

grew from 5.0 percent in 2000 to 7.0 percent in 2012.[62]  Over this period, the

percentage of people with income below 125 percent of the poverty thresholds grew

from 16.5 percent to 20.8 percent.[63]

Higher energy prices disproportionately affect these growing numbers of lower

income people.  In 2001, households with gross annual incomes below $50,000 spent

an average of 12% of their after-tax income on residential or transportation energy

costs.[64]  By 2012, these households were expected to spend an average of 20% of their

after-tax income on energy.[65]   In 2011, nearly one-third of American households had

gross annual incomes of less than $30,000 and energy costs accounted for an average

of 27 percent of their family budgets, before taking into account any energy

assistance.[66]  Nearly all of the residential electricity price increases over the past two

decades have occurred since 2000.[67]

The impact of higher energy costs is not just economic, however.  As both

common sense and a wealth of literature shows, a rise in energy prices, by depriving

consumers of purchasing power needed for the necessities of life, will result in a

decline in health and welfare.  Summarizing a large body of scientific literature, Dr.

---

[62] *Id.*

[63] *Id.*

[64] American Coalition for Clean Coal Electricity, *Energy Cost Impacts on American Families, 2001-2013*, Jan. 2013 at 2, http://www.americaspower.org/sites/default/files/Trisko%202013.pdf.

[65] *Id.*

[66] *Id.* at 3.

[67] *Id.* at 3.

Harvey Brenner of Johns Hopkins University wrote, "[i]In industrialized countries, the higher the level of income of individuals, the lower the illness and mortality rates attributed to the great majority of infections, chronic diseases and mental disturbances."[68]

In sum, the Import Restriction will interfere with North Dakota's coal market and result in increased electric costs to the detriment of North Dakota and Minnesota consumers.

### C. The Import Restriction Will Inhibit Technological Development.

Minnesota evidently believes that the key to a low-carbon future is to cap GHG emissions in the hope that non-carbon emitting resources will be built as substitutes. But those who seek to develop a worldwide strategy for GHG emissions counsel that this approach is naïve and counterproductive. The IEA's 2012 report "Tracking Clean Energy Progress,"[69] which constitutes the IEA's input and recommendations to the Clean Energy Ministerial on actions needed to support a goal of limiting global temperature rise to 2° C above preindustrial levels (which the IEA calls "ETP 2DS"), endorses capturing and storing $CO_2$ from fossil fuel electric generation and other industrial facilities that utilize fossil fuels, but notes that progress

---

[68] *The Clean Air Act and Public Health,* Before the Senate Committee on Environment and Public Works, 112th Cong. 2 (2011) (statement of Dr. Harvey Brenner, Professor, Social and Behavioral Science, University of North Texas), http://www.epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id =37188bea-2c5f-4100-a767-f264f1a1ced2.

[69] Report available at http://www.iea.org/media/etp/Tracking_Clean_Energy_Progress.pdf.

towards this technology is lagging: "The technologies with the greatest potential for energy and carbon dioxide ($CO_2$) emissions savings, however, are making the slowest progress: carbon capture and storage (CCS) is not seeing the necessary rates of investment into full-scale demonstration projects."[70]  The report notes that the status of CCS development against the 2DS objective is: "No large-scale integrated projects in place against the 38 required by 2020 to achieve the 2DS."

The IEA notes that coal is an important part of the global energy resource portfolio and that the use of coal, even without CCS, is fully compatible with the 2DS goal: "Coal is a low-cost, available and reliable resource, which is why it is widely used in power generation throughout the world.  It continues to play a significant role in the 2DS."[71]  The IEA believes that coal is compatible with the 2DS goal because the construction of modern highly efficient coal generating units can substitute for less efficient coal generating units, and thereby lower $CO_2$ emissions:

> Higher efficiency, lower emissions (HELE) coal technologies - including supercritical pulverised coal combustion (SC), ultra-supercritical pulverised coal combustion (USC) and integrated gasification combined cycle (IGCC) - must be deployed. Given that CCS technologies are not being developed or deployed quickly, the importance of deploying HELE technology to reduce emissions from coal-fired power plants is even greater in the medium term.[72]

---

[70] *Id.* at 5.
[71] *Id.* at17.
[72] *Id.*

The IEA makes an equally important point about the need for developing countries to utilize more efficient new coal technologies rather than less efficient technologies that are still being used in many cases:

> More advanced coal technologies are being deployed, but inefficient coal technologies still account for almost half of new coal fired power plants being built. Unless growth in coal-fired power generation and subcritical coal development curtails, we are unlikely to achieve the 2DS objectives.[73]

By chasing an impractical solution to the global GHG issue – zero $CO_2$ emissions from new coal plants – the Import Restriction, thus, is exactly the wrong approach. Minnesota's statute will prevent the construction of new coal-fueled facilities of any kind in the Upper Midwest because CCS is impractical. If other states with large population centers can do the same, then new coal generation cannot be built in the United States. Technological development of more efficient coal generation plants in the United States will thus cease, removing a major driver of critically needed worldwide technological development. In the end, the result will be the opposite of the intended result: the rest of the world will continue to build coal facilities, but they will be less efficient and more GHG-emitting than they might have been.

---

[73] *Id.* at 18.

# CONCLUSION

In sum, the Import Restriction's burden on interstate commerce is substantial, whereas the in-state benefit it may produce is non-existent. As a result, it is an unconstitutional violation of the Commerce Clause. Clean Coal Amici respectfully request that the judgment of the District Court be affirmed.

Dated: January 27, 2015                    Respectfully submitted,


                                           /s/Patrick Hofer
                                           Peter S. Glaser
                                           Patrick F. Hofer
                                           Troutman Sanders LLP
                                           Suite 1000
                                           401 9th Street NW
                                           Washington, DC 20004-2134
                                           (202) 274-2998 (telephone)
                                           (202) 274-2994 (fax)
                                           peter.glaser@troutmansanders.com
                                           patrick.hofer@troutmansanders.com

                                           ATTORNEYS FOR AMICUS CURIAE
                                           AMERICAN      COALITION      FOR
                                           CLEAN COAL ELECTRICITY
                                           AND NATIONAL
                                           MINING ASSOCIATION

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32(a)

Pursuant to F.R.AP. 32(a), the undersigned hereby certifies that the foregoing Amicus Brief was prepared in Microsoft Word 2010 using 14-point font.

The undersigned further certifies that this Brief complies with the type-length limitation as there are 6,707 words in this Brief, according to Microsoft Word 2010's word count, including headings, footnotes and quotations and excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: January 27, 2015

s/Patrick F. Hofer
Patrick F. Hofer

**CERTIFICATE OF COMPLIANCE WITH LOCAL R. 28A(h)(2)**

The undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus-free.

Dated: January 27, 2015

s/Patrick F. Hofer
Patrick F. Hofer

# CERTIFICATE OF SERVICE

I certify that on January 27, 2015, the Amicus Brief of the American Coalition for Clean Coal Electricity and the National Mining Association was electronically submitted to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: January 27, 2015

s/Patrick F. Hofer
Patrick F. Hofer