Nos. 14-2156 and 14-2251

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

STATE OF NORTH DAKOTA, et al.,

Appellees/Cross-Appellants,

v.

BEVERLY HEYDINGER, Commissioner and Chair,
Minnesota Public Utilities Commission, et al.,

Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the District of Minnesota
Honorable Susan Richard Nelson, District Judge

[PROPOSED] BRIEF OF *AMICI CURIAE*
PACIFIC LEGAL FOUNDATION & NATIONAL FEDERATION
OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL
CENTER IN SUPPORT OF APPELLEES AND AFFIRMANCE

JONATHAN WOOD
    Pacific Legal Foundation
    930 G Street
    Sacramento, California 95814
    Telephone: (916) 419-7111
    Facsimile: (916) 419-7747

Counsel for *Amici Curiae*
Pacific Legal Foundation
and National Federation
of Independent Business
Small Business Legal Center

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Pacific Legal Foundation, a nonprofit corporation organized under the laws of California, states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

The NFIB Small Business Legal Center is a 501(c)(3) public interest law firm. It is affiliated with the National Federation of Independent Business, a 501(c)(6) business association, which supports the NFIB Small Business Legal Center through grants and exercises common control of the NFIB Small Business Legal Center through officers and directors. No publicly held company has 10% or greater ownership of the NFIB Small Business Legal Center.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

IDENTITY AND INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  I. FEDERALISM PROMOTES GOVERNMENTAL
     ACCOUNTABILITY AND INDIVIDUAL LIBERTY BY
     FOSTERING INTERGOVERNMENTAL COMPETITION . . . . . 4

  II. THE DORMANT COMMERCE CLAUSE FORBIDS STATE
      LAWS THAT FRUSTRATE INTERSTATE COMPETITION . . . . 7

     A. Extraterritorial Regulations Are Forbidden
        by the Dormant Commerce Clause . . . . . . . . . . . . . . . . . . . . 7

     B. Absent the Prohibition on Extraterritorial Regulation,
        States Could Adopt All Sorts of Mischievous Regimes . . . . . . 11

  III. MINNESOTA'S NEXT GENERATION
       ENERGY ACT IS AN UNCONSTITUTIONAL
       EXTRATERRITORIAL REGULATION . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) . . . . . . . . . . . 20

**Page**

CERTIFICATE OF COMPLIANCE WITH
EIGHTH CIRCUIT RULE 28A(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## Cases

*Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) . . . . . . . . 16

*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) . . . . . . . . . . . . . . . 9

*Bond v. United States*, 131 S. Ct. 2355 (2011) . . . . . . . . . . . . . . . . . . . . 4

*Brown-Forman Distillers Corp. v. New York
    State Liquor Auth.*, 476 U.S. 573 (1986) . . . . . . . . . . . . . . . . . 9, 15, 19

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
    511 U.S. 383 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) . . . . . . . . . 8-10

*Coleman v. Thompson*, 501 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . 4

*Cotto Waxo Co. v. Williams*, 46 F.3d 790 (8th Cir. 1995) . . . . . . . . . . . 3

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) . . . . . . . . . . . . . 11

*Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) . . . . . . . . . 10

*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824) . . . . . . . . . . . . . . . . . . 7-8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . . . . . . . . . . 2, 5-6

*Hawkes Co. v. U.S. Army Corps of Eng'rs*,
    No. 13-3067 (8th Cir. argued Dec. 11, 2014) . . . . . . . . . . . . . . . . . . . 1

*Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989) . . . . . . . . . . . . 8-9, 14, 18

*Johnson v. Haydel*, 278 U.S. 16 (1928) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) . . . . . . . . . . . . . . . 7

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) . . . . 11, 17

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) . . . . 11, 17

*New Energy Co. v. Limbach*, 486 U.S. 269 (1988) . . . . . . . . . . . . . . . . . 8

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) . . . . . . . . . 2, 15, 18

*New York v. United States*, 505 U.S. 144 (1992) . . . . . . . . . . . . . . . . . 4

*North Dakota v. Heydinger*,
 15 F. Supp. 3d 891 (D. Minn. 2014) . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868) . . . . . . . . . . . . . . . . . . . 7

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) . . . . . . . . . . . 10, 15, 19

*Rocky Mountain Farmers Union v. Corey*,
730 F.3d 1070 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rocky Mountain Farmers Union v. Corey*,
 No. 13-1148 (U.S. cert. denied June 30, 2014) . . . . . . . . . . . . . . . . . . 1

*Sackett v. E.P.A.*, 132 S. Ct. 1367 (2012) . . . . . . . . . . . . . . . . . . . . . . . . 1

*Saenz v. Roe*, 526 U.S. 489 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Toomer v. Witsell*, 334 U.S. 385 (1948) . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Bailey*, 571 F.3d 791 (8th Cir. 2009) . . . . . . . . . . . . . 1

*United States v. Carolene Prod. Co.*, 304 U.S. 144 (1938) . . . . . . . . . . . 7

*Waste Sys. Corp. v. County of Martin, Minn.*,
  985 F.2d 1381 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Statutes

16 U.S.C. § 824(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

29 U.S.C. § 158(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

2007 Minn. Laws Ch. 136, art. 5, § 3 . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

Cal. Health & Safety Code § 38505 . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    § 38562 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Minn. Stat. § 216H.03, subd. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

## Constitution

U.S. Const. art I, § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## Miscellaneous

Alt, Robert D., *Is Federalism Conservative?*, National Review Online
  (Apr. 29, 2003), http://www.nationalreview.com/
  articles/206732/federalism-conservative/robert-d-alt . . . . . . . . . . . . 6

Barnett, Randy E., *The Original Meaning of the
  Commerce Clause*, 68 U. Chi. L. Rev. 101 (2001) . . . . . . . . . . . . . . . 8

Barnett, Randy, *Another Misbegotten Reliance on
  Gonzales v. Raich*, Volokh Conspiracy (Dec. 31, 2014),
  http://www.washingtonpost.com/news/volokh-conspiracy
  /wp/2014/12/31/another-misbegotten-reliance-on-
  gonzales-v-raich/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Bolick, Clint, *Grassroots Tyranny:*
  *The Limits of Federalism* (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Braun, Thomas, *The Border Battle: North Dakota's Suit*
  *Against Minnesota and the Future of the Next Generation*
  *Energy Act*, 36 Hamline L. Rev. 479 (2013) . . . . . . . . . . . . . . . . . . . . 17

Brennan, Geoffrey & Buchanan, James M., *The Power to Tax:*
  *Analytical Foundations of a Fiscal Constitution* (1980) . . . . . . . . . . . 5

Burke, Debra, et al., *Minimum Wage and Unemployment Rates:*
  *A Study of Contiguous Counties*, 46 Gonz. L. Rev. 661 (2011) . . . . . 12

Dolan, Matthew & Maher, Kris, *Unions Dealt Blow in*
  *UAW's Home State*, Wall St. J., Dec. 12, 2012, *available at*
  http://online.wsj.com/public/resources/documents/print/WSJ_-
  A0001-20121212.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Editorial, *Holiday Guide: Shop Here, Not There!*, The Advocate
  (Dec. 1, 2014), *available at* http://www.advocate.com/business/
  2014/12/01/holiday-guide-shop-here-not-there?page=full . . . . . . . . . 13

Fiorella, Sam, *Starbucks Enters Same-Sex Marriage*
  *Boycott Wars*, Huffingtonpost.com (Nov. 5, 2013),
  http://www.huffingtonpost.com/sam-fiorella/starbucks-
  enters-same-sex-marriage-boycott-_b_4203752.html . . . . . . . . . . . . 13

Gerken, Heather K., *A New Progressive Federalism*, Democracy
  (2012), *available at* http://www.democracyjournal.org/24/a-new-
  progressive-federalism.php?page=all (last visited Jan. 15, 2015) . . . 6

Gerken, Heather K., *Foreword: Federalism All*
  *the Way Down*, 124 Harv. L. Rev. 4 (2010) . . . . . . . . . . . . . . . . . . . . . 6

Ilgaz, Zeynep, *How Marijuana Legislation Will Affect Drug Testing In The Workplace*, Forbes (Sept. 30, 2014), *available at* http://www.forbes.com/sites/groupthink/2014/09/30/how-marijuana-legislation-will-affect-drug-testing-in-the-workplace/ . . 14

Jeffe, Sherry Bebitch & Jeffe, Douglas, *California v. Texas in fight for the future*, Reuters (Mar. 8, 2013), http://blogs.reuters.com/great-debate/2013/03/08/california-v-texas-in-fight-for-the-future/ . . . . . . . . . . . . . . . . . . . . . . 6

Massey, Calvin, *The California Egg Law and the Dormant Commerce Clause*, The Faculty Lounge (Mar. 13, 2014), http://www.thefacultylounge.org/2014/03/the-california-egg-law-and-the-dormant-commerce-clause.html . . . . . . . . . . . . . . 13

McConnell, Michael W., *Federalism: Evaluating the Founders' Design*, 54 U. Chi. L. Rev. 1484 (1987) . . . . . . . . . . . . 5, 17

McGinnis, John O. & Somin, Ilya, *Federalism vs. States' Rights: A Defense of Judicial Review in a Federal System*, 99 Nw. U. L. Rev. 89 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pasulka, Nicole, *Right-to-Work Laws, Explained*, Mother Jones (Mar. 16, 2012), *available at* http://www.motherjones.com/politics/2012/03/what-are-right-to-work-laws . . . . . . . . . . . . . . . . . . 12

Pigou, A.C., *The Economics of Welfare* (1920) . . . . . . . . . . . . . . . . . . . . 10

*Regional Transmission Organizations*, 89 FERC ¶ 61,285 (Dec. 20, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sandefur, Timothy, *The Conscience of the Constitution* (2014) . . . . . . . 9

Somin, Ilya, *Democracy and Political Ignorance: Why Smaller Government is Smarter* (2013) . . . . . . . . . . . . . . . . . . . . 6

The Federalist No. 11 (Alexander Hamilton), *available at* http://avalon.law.yale.edu/18th_century/fed11.asp (last visited Jan. 15, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tiebout, Charles M., *A Pure Theory of Local Expenditures*, 64 J. Pol. Econ. 416 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. Dep't of Labor, *Minimum Wage Laws in the United States – January 1, 2015*, http://www.dol.gov/whd/minwage/america.htm . . 12

Vedder, Richard & Robe, Jonathan, *The High Cost of Big Labor: An Interstate Analysis of Right to Work Laws*, Competitive Enterprise Institute (2014), *available at* http://cei.org/sites/ default/files/Richard%20Vedder%20and%20Jonathan%20 Robe%20-%20An%20Interstate%20Analysis%20of%20 Right%20to%20Work%20Laws.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## IDENTITY AND INTEREST OF *AMICI CURIAE*

Pacific Legal Foundation (PLF) was founded in 1973 and is widely recognized as the largest and most experienced nonprofit legal foundation of its kind. It defends limited government, property rights, and a balanced approach to environmental protection in courts nationwide. PLF has extensive experience litigating environmental and constitutional issues, *e.g.*, *Hawkes Co. v. U.S. Army Corps of Eng'rs*, No. 13-3067 (8th Cir. argued Dec. 11, 2014); *Sackett v. E.P.A.*, 132 S. Ct. 1367 (2012), and participated as *amicus curiae* in *Rocky Mountain Farmers Union v. Corey*, No. 13-1148 (U.S. cert. denied June 30, 2014), and *United States v. Bailey*, 571 F.3d 791 (8th Cir. 2009).

The National Federation of Independent Business Small Business Legal Center (NFIB Legal Center) is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses on issues of public interest affecting them. The National Federation of Independent Business (NFIB) is the nation's leading small business association, representing members in Washington, D.C., and all 50 state capitals. Founded in 1943 as a nonprofit, nonpartisan organization, its mission is to promote and protect the right of its members to own, operate

and grow their businesses.  To further NFIB's role as the voice for small business, the NFIB Legal Center frequently files amicus briefs in cases that will impact small businesses.

Amici submit this brief because they believe their public policy perspectives and litigation experience will provide an additional viewpoint with respect to the issues presented, which will be helpful to this court.[1]

## INTRODUCTION

The genius of American federalism is that—by limiting the federal government's power—the Constitution requires most policy questions to be decided by states that must compete for voters, taxpayers, and industry. *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  This competitive pressure forces the states to be more responsive to the wishes of those they govern and, ultimately, leads to better, smarter, regulation.

States are generally free to experiment with novel solutions to vexing public policy problems.  *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (describing the states as laboratories of democracy).  But the Commerce Clause forbids states from frustrating

---

[1]   Counsel for the parties in this case did not author this brief in whole or in part.  No person or entity, other than Amici, their members, and their counsel made a monetary contribution to the preparation and submission of this brief.

the federal competitive regime by extending their experiments to commercial activity occurring beyond their borders. *See Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995) ("[A] statute has extraterritorial reach when it necessarily requires out-of-state commerce to be conducted according to in-state terms.").

Minnesota's Next Generation Energy Act runs afoul of this core principle. The state adopted the Act to regulate carbon dioxide emissions from electricity generation. *See* 2007 Minn. Laws Ch. 136, art. 5, § 3. But, recognizing that regulation increases the cost of generating electricity within the state, and concerned that this would lead to more of the electricity used in Minnesota being generated elsewhere, the legislation requires all imported electricity to have also been produced according to Minnesota's regulations. *See* Minn. Stat. § 216H.03, subd. 3. Because Minnesota purports to regulate out-of-state production, without regard to any characteristic or local impact of the imported electricity, the legislation runs afoul of the Dormant Commerce Clause. *See Cotto Waxo Co.*, 46 F.3d at 794.

# ARGUMENT

## I

## FEDERALISM PROMOTES GOVERNMENTAL ACCOUNTABILITY AND INDIVIDUAL LIBERTY BY FOSTERING INTERGOVERNMENTAL COMPETITION

The cornerstone of the United States Constitution is the principle of federalism. John O. McGinnis & Ilya Somin, *Federalism vs. States' Rights: A Defense of Judicial Review in a Federal System*, 99 Nw. U. L. Rev. 89, 89 (2004). Although the term is most commonly invoked as a limit on federal power, it also concerns similar excesses by states. *See* Clint Bolick, *Grassroots Tyranny: The Limits of Federalism* 13-36 (1993). By protecting against the risk that *any* government will exceed its power, federalism "'secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York v. United States*, 505 U.S. 144, 181 (1992) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)). "When government acts in excess of its lawful powers, that liberty is at stake." *See Bond v. United States*, 131 S. Ct. 2355, 2364 (2011).

One of the principal means by which federalism achieves this aim is through competition amongst state governments. Because of the relative

ease of migrating within the United States, states must be responsive to the preferences of voters, taxpayers, and industries, which otherwise may flee for greener pastures. *See* Charles M. Tiebout, *A Pure Theory of Local Expenditures*, 64 J. Pol. Econ. 416, 416-18 (1956) (government power should be decentralized to allow people to "vote with their feet"); *see also* Geoffrey Brennan & James M. Buchanan, *The Power to Tax: Analytical Foundations of a Fiscal Constitution* 173-86 (1980). As a result of this competition, states are under constant pressure to find new and better ways to address public problems, while minimizing burdens. As the Supreme Court has explained, federalism

> assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry.

*Gregory*, 501 U.S. at 458.

These competitive pressures ultimately lead to better results for all by aligning government with the preferences of the governed. *See* Michael W. McConnell, *Federalism: Evaluating the Founders' Design*, 54 U. Chi. L. Rev. 1484, 1498-1500 (1987). Because it is dependent on these preferences, federalism is non-partisan and does not necessarily favor

conservative or progressive results. *See* Heather K. Gerken, *A New Progressive Federalism*, Democracy (2012);[2] Heather K. Gerken, *Foreword: Federalism All the Way Down*, 124 Harv. L. Rev. 4, 44-55 (2010); Robert D. Alt, *Is Federalism Conservative?*, National Review Online (Apr. 29, 2003).[3] For example, in the twentieth century, African-Americans took advantage of their ability to "vote with their feet" to escape the brutality of the Jim Crow South.[4] More recently, residents of liberal, high-tax states, like California, have been migrating to economically freer states, like Texas.[5]

For this intergovernmental competition to work, however, courts must enforce the Constitution's structural protections for federalism. They must limit the federal government's power, lest voters be subjected to unpopular or ineffective federal policies with no means to escape. *See Gregory*, 501 U.S. at 458. And they must invalidate state laws that

---

[2]  *Available at* http://www.democracyjournal.org/24/a-new-progressive-federalism.php?page=all (last visited Jan. 15, 2015).

[3]  *Available at* http://www.nationalreview.com/articles/206732/federalism-conservative/robert-d-alt.

[4]  *See* Ilya Somin, *Democracy and Political Ignorance: Why Smaller Government is Smarter* 128-35 (2013).

[5]  *See* Sherry Bebitch Jeffe & Douglas Jeffe, *California v. Texas in fight for the future*, Reuters (Mar. 8, 2013), http://blogs.reuters.com/great-debate/2013/03/08/california-v-texas-in-fight-for-the-future/.

attempt to squelch these competitive pressures, including restrictions on the right to enter or exit the state, *see Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868) (the Privileges and Immunities Clause protects freedom of movement among the states), attempts to appropriate immobile assets, *cf. Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536-48 (2005) (Due Process Clause protects against uncompensated takings and takings that do not substantially advance a legitimate public purpose), and restrictions targeting vulnerable minorities, *see United States v. Carolene Prod. Co.*, 304 U.S. 144, 152 n.4 (1938).

## II

## THE DORMANT COMMERCE CLAUSE FORBIDS STATE LAWS THAT FRUSTRATE INTERSTATE COMPETITION

### A. Extraterritorial Regulations Are Forbidden by the Dormant Commerce Clause

Like the right to travel amongst the states and protections against discrimination and appropriation of property, courts must enforce the Commerce Clause for intergovernmental competition to thrive. U.S. Const. art. I, § 8. Although this clause is primarily a positive grant of power to the federal government, courts have recognized for nearly two centuries that it also implicitly limits state power. *See Gibbons v. Ogden*,

22 U.S. (9 Wheat.) 1, 189 (1824); *see also New Energy Co. v. Limbach*, 486 U.S. 269, 273 (1988). In particular, it prohibits state restrictions that frustrate the movement of persons and goods across state lines. *See C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390-91 (1994).

Because such barriers were a chief concern of the Constitution's architects,[6] the Supreme Court's Dormant Commerce Clause jurisprudence reflects a special concern for maintaining a national economic union free of state-imposed limits on interstate commerce. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989). According to this jurisprudence, state laws that expressly discriminate against interstate commerce and those that have the practical effect of regulating conduct beyond the state's borders are so odious to the federal system that they are per se invalid. *Id.* at 332 ("A state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause."); *City of Philadelphia v. New Jersey*, 437 U.S. 617,

---

[6] *See* Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 132-46 (2001); The Federalist No. 11 (Alexander Hamilton), *available at* http://avalon.law.yale.edu/18th_century/fed11.asp (last visited Jan. 15, 2015).

626-27 (1978) (forbidding laws that expressly discriminate against interstate commerce).

One example of this latter category—extraterritorial regulations—is a statute that requires out-of-state producers to affirm that they will not charge a higher price within the state than that charged in neighboring states. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 575 (1986); *Healy*, 491 U.S. at 326; *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 519 (1935). These price-control statutes regulate conduct beyond the state's borders and forbid out-of-state producers from charging different prices in states to reflect each state's regulatory burden. *See Brown-Forman*, 476 U.S. at 575-76 (noting the extensive state regulation of the production, sale, and distribution of alcohol); *Healy*, 491 U.S. at 326. If states could impose such a requirement, they could shift the cost of their regulations from their own citizens to residents of surrounding states—to whom they are not politically accountable. *See* Timothy Sandefur, *The Conscience of the Constitution* 139-45 (2014) (rent-seeking causes politicians to benefit favor-currying discrete special interests, while broadly distributing the

resulting costs upon those groups to which the politicians are not accountable).[7]

Another example of extraterritorial regulation is a state law that attempts to prevent commercial activity from fleeing to other states where costs are lower. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 141-45 (1970) (local processing requirements "have been consistently invalidated").[8] Such laws do not attempt to mitigate local effects, but instead promote or protect local industry at the expense of out-of-state competition. *See id.* at 144-45. They are " 'basically a protectionist measure' " and offend the Commerce Clause. *See Waste Sys. Corp. v. County of Martin, Minn.*, 985 F.2d 1381, 1385 (8th Cir. 1993) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

---

[7] *See also* A.C. Pigou, *The Economics of Welfare* 172 (1920) (explaining the problem of externalities, or spillover effects).

[8] *See also Toomer v. Witsell*, 334 U.S. 385, 403-06 (1948) (state cannot require shrimp to be unloaded, packed, and marked within the state before exporting); *Johnson v. Haydel*, 278 U.S. 16, 16-17 (1928) (state cannot forbid oysters from being exported to other states for processing); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 11-14 (1928) (state cannot forbid shrimp from being exported to other states for processing).

The Dormant Commerce Clause narrowly permits states to regulate the domestic sale of out-of-state products based only on the products' characteristics and local effects. For example, a state may require that goods conform to safety or packaging requirements to ameliorate hazards within the state or to reduce litter and solid waste accumulation. *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473-74 (1981) (state may prohibit sale of milk in nonreturnable, nonrefillable containers because of local disposal concerns); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107-08 (2d Cir. 2001) (state may require all light bulbs containing mercury sold in the state to have a label informing consumers of that fact). But even this limited type of regulation is unconstitutional if the burden on interstate commerce clearly outweighs the local interest. *See Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008).

## B. Absent the Prohibition on Extraterritorial Regulation, States Could Adopt All Sorts of Mischievous Regimes

Unless courts continue to strike down laws that attempt to frustrate intergovernmental competition, states could substantially interfere with the free flow of goods across state boundaries. Suppose, for example, New York—which has a minimum wage higher than the federal

standard[9]—became concerned that higher labor costs would cause its citizens and businesses to leave the state.[10] It might pass a law forbidding importation of goods produced elsewhere using labor that is paid less than New York's minimum wage.

Or suppose that a state legislature that favored a large labor union became concerned that "right to work" states[11] threatened its economy by offering lower costs to industry and consumers.[12] To prevent this competition, could the state ban importation of goods produced in states

[9]    *See* U.S. Dep't of Labor, *Minimum Wage Laws in the United States – January 1, 2015*, http://www.dol.gov/whd/minwage/america.htm.

[10]   *See, e.g.*, Debra Burke, et al., *Minimum Wage and Unemployment Rates: A Study of Contiguous Counties*, 46 Gonz. L. Rev. 661, 678-80 (2011) (describing employment effects of different minimum wage laws in state border areas of Washington and Idaho).

[11]   *See* Matthew Dolan & Kris Maher, *Unions Dealt Blow in UAW's Home State*, Wall St. J., Dec. 12, 2012, *available at* http://online.wsj.com/public/resources/documents/print/WSJ_-A0001-20121212.pdf; Nicole Pasulka, *Right-to-Work Laws, Explained*, Mother Jones (Mar. 16, 2012), *available at* http://www.motherjones.com/politics/2012/03/what-are-right-to-work-laws (providing more detail about right to work laws generally, and their possible consequences).

[12]   *See* Richard Vedder & Jonathan Robe, *The High Cost of Big Labor: An Interstate Analysis of Right to Work Laws*, Competitive Enterprise Institute (2014), *available at* http://cei.org/sites/default/files/Richard%20Vedder%20and%20Jonathan%20Robe%20-%20An%20Interstate%20Analysis%20of%20Right%20to%20Work%20Laws.pdf (reporting that right-to-work states experience higher population and job growth).

that do not allow "closed" shop agreements[13] or from businesses that do not have such agreements?

If courts stop rigorously enforcing the prohibition against extraterritorial regulations, the resulting interstate conflict could expand beyond economic issues.[14] For example, a state that forbids same-sex marriage or one that requires companies to provide benefits to same-sex partners might fear that workers and employers would relocate to avoid public criticism.[15] To avoid this consequence, a state might discriminate against goods manufactured in other states based on those states' laws

---

[13] A "closed" shop agreement is an agreement between an employer and a labor union to require membership in the union as a condition of employment. *See* 29 U.S.C. § 158(a)(3) (authorizing such agreements).

[14] *See, e.g.*, Calvin Massey, *The California Egg Law and the Dormant Commerce Clause*, The Faculty Lounge (Mar. 13, 2014), http://www.thefacultylounge.org/2014/03/the-california-egg-law-and-the-dormant-commerce-clause.html (discussing the constitutionality of a California law requiring all eggs sold in the state to have been produced in coops that comply with its requirements for humane treatment of chickens).

[15] *See* Editorial, *Holiday Guide: Shop Here, Not There!*, The Advocate (Dec. 1, 2014), *available at* http://www.advocate.com/business/2014/12/01/holiday-guide-shop-here-not-there?page=full (boycott of companies that oppose same-sex marriage); Sam Fiorella, *Starbucks Enters Same-Sex Marriage Boycott Wars*, Huffingtonpost.com (Nov. 5, 2013), http://www.huffingtonpost.com/sam-fiorella/starbucks-enters-same-sex-marriage-boycott-_b_4203752.html (boycott of Starbucks for supporting same-sex marriage).

regarding the status of same-sex couples or whether benefits are extended to same-sex partners.

States that have not legalized marijuana might be concerned that workers in states which have may produce inferior products.[16] *See* Zeynep Ilgaz, *How Marijuana Legislation Will Affect Drug Testing In The Workplace*, Forbes (Sept. 30, 2014);[17] *see also* Randy Barnett, *Another Misbegotten Reliance on Gonzales v. Raich*, Volokh Conspiracy (Dec. 31, 2014) (criticizing Nebraska and Oklahoma's challenge to Colorado's legalization of marijuana).[18] Could they thus discriminate against interstate commerce from these states, irrespective of whether the goods are actually inferior?

In each of these hypotheticals, a state's policy choices might be expected to cause adverse consequences on the state's own industries and

---

[16] Contrast this with a regulation that directly regulates inferior products. A regulation focused on the actual condition of the product would not offend the Dormant Commerce Clause because that would be a regulation based an attribute of the product itself. *See, e.g.*, *Healy*, 491 U.S. at 337.

[17] *Available at* http://www.forbes.com/sites/groupthink/2014/09/30/how-marijuana-legislation-will-affect-drug-testing-in-the-workplace/.

[18] http://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/12/31/another-misbegotten-reliance-on-gonzales-v-raich/.

economy. So be it. A state may not address this competitive disadvantage by extending its regulation to commerce occurring beyond its borders. Although states are free to adopt innovative solutions to contested public policy issues, they cannot frustrate their sister-states' equal ability to experiment nor can they avoid intergovernmental competition. *Cf. New State Ice Co.*, 285 U.S. at 311 (Brandeis, J., dissenting) (states are laboratories of democracy). The Dormant Commerce Clause forbids it. *See Brown-Forman*, 476 U.S. at 575; *Pike*, 397 U.S. at 141-45.

## III

## MINNESOTA'S NEXT GENERATION ENERGY ACT IS AN UNCONSTITUTIONAL EXTRATERRITORIAL REGULATION

Minnesota's Next Generation Energy Act limits future increases in "statewide power sector" emissions. *See* 2007 Minn. Laws Ch. 136, art. 5, § 3; Minn. Stat. § 216H.03, subd. 3. However, the Act is not limited to regulating electricity production within the state—it also forbids future importation of electricity that was not generated in accordance with the statute. *See* Minn. Stat. § 216H.03, subd. 3.

Once on the regional electric grid,[19] electricity generated in compliance with the statute is indistinguishable from that which was not. *See North Dakota v. Heydinger*, 15 F. Supp. 3d 891, 917-18 (D. Minn. 2014).[20] The manner of production does not affect any environmental impacts in the state. *See id.* The electricity is of no different quality and imposes no unique risks. *See id.* In fact, the statute makes no reference to local impacts from this out-of-state generation, nor does it require a showing of local impacts before that production can be regulated. *See id.* at 897-99. Simply put, Minnesota is not regulating the local impacts of a

---

[19] Federal law encourages the development of a "grid" to foster interstate transmission of electricity. *See* 16 U.S.C. § 824(a); *see also Regional Transmission Organizations*, 89 FERC ¶ 61,285 (Dec. 20, 1999). Electricity can be loaded onto the grid from any point and transmitted to any other point, thus electricity consumed in Minnesota need not be produced there. *See North Dakota v. Heydinger*, 15 F. Supp. 3d 891, 895-96 (D. Minn. 2014).

[20] Although *Amici* contend that *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), was wrongly decided, that case is distinguishable because of the nature of the electricity grid. Ethanol bound for California could be segregated from that bound for other markets, which would limit—but not eliminate—the extraterritorial nature of California's regulation. *See id.* at 1080-81. Because of the nature of the interstate electrical grid, electricity bound for Minnesota cannot be segregated from electricity going elsewhere. *See Heydinger*, 15 F. Supp. 3d at 917-18. Minnesota's regulation, therefore, is more analogous to pervasive state regulation of the internet, which does run afoul of the Commerce Clause. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 100-01 (2d Cir. 2003).

product produced in another state, but is extending its regulatory regime beyond its borders. *See Heydinger*, 15 F. Supp. 3d at 897-98. Therefore, this case is readily distinguishable from *Clover Leaf Creamery* and *National Electric Manufacturers*. *See Clover Leaf Creamery*, 449 U.S. at 473-74; *Nat'l Elec. Mfrs.*, 272 F.3d at 107-08.

Minnesota's reason for regulating out-of-state electricity generation is apparent: Minnesota generators that must compete openly with out-of-state generators will suffer due to the cost of complying with the state's regulatory regime. *See* Thomas Braun, *The Border Battle: North Dakota's Suit Against Minnesota and the Future of the Next Generation Energy Act*, 36 Hamline L. Rev. 479, 493-94 (2013) (discussing the risk of "leakage"—the transfer of production from Minnesota to other states as a consequence of regulatory burdens).[21] Industry opponents of the regime could "vote with their feet" by shifting production to other states. *See* McConnell, *supra*, at 1498-1500. Similarly, residents and businesses might flee the state in the face of escalating utility bills. However,

---

[21] California, which similarly regulates emissions regardless of where they occur, has been more up-front about this protectionist purpose. *See* Cal. Health & Safety Code §§ 38505, 38562 (defining "leakage" and declaring a policy to minimize this emigration).

Minnesota can no more avoid the former result in this way than it could the latter by regulating residents after they leave or taxing their exit. *Cf. Saenz v. Roe*, 526 U.S. 489, 502-03 (1999) (state authority to treat citizens of other states differently than its own citizens wanes when the visitor moves and establishes a home in the new state, at which point the former residency is irrelevant to how the states must treat her).

Minnesota may adopt whatever regime to regulate its emissions that it wishes; so may North Dakota. *Cf. New State Ice Co.*, 285 U.S. at 311 (Brandeis, J., dissenting). If they choose differently, and interstate competition leads to voters, taxpayers, or industry moving from one state to the other, the losing state may not frustrate the other's choice by extending its regulatory hand into commercial activity occurring there. *See Healy*, 491 U.S. at 336 (Dormant Commerce Clause requires consideration of how a statute "may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."). Minnesota's attempt to avoid this interstate competition is precisely the evil that the Dormant Commerce Clause's extraterritoriality prong was intended to prevent. Just as the Supreme Court recognized that a state cannot spread the

burdens of its own regime through extraterritorial price-control regulations, *see Brown-Forman*, 476 U.S. at 575, or prevent production from relocating to other states, *see Pike*, 397 U.S. at 141-45, this Court should recognize that Minnesota's effort to thwart competition is improper.

## CONCLUSION

Minnesota's extraterritorial regulation frustrates a key structural guaranty of federalism, the Dormant Commerce Clause. The decision below—holding that the extraterritorial aspects of the statute are unconstitutional—should be affirmed.

DATED:  January 21, 2015.

Respectfully submitted,


_____/s/ Jonathan Wood_____
JONATHAN WOOD

Counsel for *Amici Curiae*
Pacific Legal Foundation
and National Federation
of Independent Business
Small Business Legal Center

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS.

1.  This *amicus* brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    _X_  It contains 3,745 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii), or

    ___  It uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    _X_  It has been prepared in a proportionally spaced typeface using WordPerfect X5 in font style Century and font size 14, or

    ___  It has been prepared in a monospaced typeface using WordPerfect X5 with ___ characters per inch and type style _____.

DATED:  January 21, 2015.

_____/s/ Jonathan Wood_____
Attorney for *Amici Curiae*
Pacific Legal Foundation and National
Federation of Independent Business
Small Business Legal Center

## CERTIFICATE OF COMPLIANCE
## WITH EIGHTH CIRCUIT RULE 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus-free.

/s/ Jonathan Wood
JONATHAN WOOD

# CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_____/s/ Jonathan Wood_____
JONATHAN WOOD